## JAFFEE, SPECIAL ADMINISTRATOR FOR ALLEN, DECEASED *v.* REDMOND ET AL.

No. 95–266.   Argued February 26, 1996—Decided June 13, 1996

2

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined as to Part III, *post*, p. 18.

*Kenneth N. Flaxman* argued the cause for petitioner. With him on the briefs were *Ronald L. Futterman* and *Craig B. Futterman*.

*Gregory E. Rogus* argued the cause for respondents. With him on the brief were *Paul E. Wojcicki, Robert E. Wilens,* and *Richard N. Williams*.

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days* and *Deputy Solicitor General Bender*.*

JUSTICE STEVENS delivered the opinion of the Court.

After a traumatic incident in which she shot and killed a man, a police officer received extensive counseling from a

---

*Briefs of *amici curiae* urging affirmance were filed for the American Association of State Social Work Boards by *John F. Atkinson;* for the American Civil Liberties Union et al. by *Steven R. Shapiro, Harvey Grossman, Leonard S. Rubenstein, Bruce J. Winick,* and *Daniel W. Shuman;* for the American Counseling Association by *Lee H. Simowitz;* for the American Psychiatric Association et al. by *Richard G. Taranto;* for the American Psychoanalytic Association et al. by *Carter G. Phillips, Rex E. Lee,* and *Joseph R. Guerra;* for the American Psychological Association by *Paul M. Smith, Robert M. Portman,* and *James L. McHugh, Jr.;* for the Employee Assistance Professionals Association, Inc., by *Peter J. Rubin;* for the Menninger Foundation by *James C. Geoly, Michael T. Zeller,* and *Kevin R. Gustafson;* for the National Association of Police Organizations, Inc., by *William J. Johnson;* for the National Association of Social Workers et al. by *Michael B. Trister, Carolyn I. Polowy, Sandra G. Nye, Kenneth L. Adams, James van R. Springer,* and *Peter M. Brody;* and for George R. Caesar et al. by *Kurt W. Melchior*.

Briefs of *amici curiae* were filed for the International Union of Police Associations, AFL–CIO, by *Michael T. Leibig;* and for the National Network to End Domestic Violence et al. by *William C. Brashares*.

licensed clinical social worker. The question we address is whether statements the officer made to her therapist during the counseling sessions are protected from compelled disclosure in a federal civil action brought by the family of the deceased. Stated otherwise, the question is whether it is appropriate for federal courts to recognize a "psychotherapist privilege" under Rule 501 of the Federal Rules of Evidence.

## I

Petitioner is the administrator of the estate of Ricky Allen. Respondents are Mary Lu Redmond, a former police officer, and the Village of Hoffman Estates, Illinois, her employer during the time that she served on the police force.[1] Petitioner commenced this action against respondents after Redmond shot and killed Allen while on patrol duty.

On June 27, 1991, Redmond was the first officer to respond to a "fight in progress" call at an apartment complex. As she arrived at the scene, two of Allen's sisters ran toward her squad car, waving their arms and shouting that there had been a stabbing in one of the apartments. Redmond testified at trial that she relayed this information to her dispatcher and requested an ambulance. She then exited her car and walked toward the apartment building. Before Redmond reached the building, several men ran out, one waving a pipe. When the men ignored her order to get on the ground, Redmond drew her service revolver. Two other men then burst out of the building, one, Ricky Allen, chasing the other. According to Redmond, Allen was brandishing a butcher knife and disregarded her repeated commands to drop the weapon. Redmond shot Allen when she believed he was about to stab the man he was chasing. Allen died at the scene. Redmond testified that before other officers

---

[1] Redmond left the police department after the events at issue in this lawsuit.

arrived to provide support, "people came pouring out of the buildings," App. 134, and a threatening confrontation between her and the crowd ensued.

Petitioner filed suit in Federal District Court alleging that Redmond had violated Allen's constitutional rights by using excessive force during the encounter at the apartment complex. The complaint sought damages under Rev. Stat. § 1979, 42 U. S. C. § 1983, and the Illinois wrongful-death statute, Iil. Comp. Stat., ch. 740, § 180/1 *et seq.* (1994). At trial, petitioner presented testimony from members of Allen's family that conflicted with Redmond's version of the incident in several important respects. They testified, for example, that Redmond drew her gun before exiting her squad car and that Allen was unarmed when he emerged from the apartment building.

During pretrial discovery petitioner learned that after the shooting Redmond had participated in about 50 counseling sessions with Karen Beyer, a clinical social worker licensed by the State of Illinois and employed at that time by the Village of Hoffman Estates. Petitioner sought access to Beyer's notes concerning the sessions for use in cross-examining Redmond. Respondents vigorously resisted the discovery. They asserted that the contents of the conversations between Beyer and Redmond were protected against involuntary disclosure by a psychotherapist-patient privilege. The district judge rejected this argument. Neither Beyer nor Redmond, however, complied with his order to disclose the contents of Beyer's notes. At depositions and on the witness stand both either refused to answer certain questions or professed an inability to recall details of their conversations.

In his instructions at the end of the trial, the judge advised the jury that the refusal to turn over Beyer's notes had no "legal justification" and that the jury could therefore presume that the contents of the notes would have been un-

6

favorable to respondents.[2] The jury awarded petitioner $45,000 on the federal claim and $500,000 on her state-law claim.

The Court of Appeals for the Seventh Circuit reversed and remanded for a new trial. Addressing the issue for the first time, the court concluded that "reason and experience," the touchstones for acceptance of a privilege under Rule 501 of the Federal Rules of Evidence, compelled recognition of a psychotherapist-patient privilege.[3]  51 F. 3d 1346, 1355 (1995). "Reason tells us that psychotherapists and patients share a unique relationship, in which the ability to communicate freely without the fear of public disclosure is the key to successful treatment." *Id.*, at 1355–1356. As to experience, the court observed that all 50 States have adopted some form of the psychotherapist-patient privilege. *Id.*, at 1356. The court attached particular significance to the fact that Illinois law expressly extends such a privilege to social workers like Karen Beyer.[4]  *Id.*, at 1357. The court also noted that, with one exception, the federal decisions rejecting the privilege were more than five years old and that the "need and demand for counseling services has skyrocketed during the past several years." *Id.*, at 1355–1356.

---

[2] App. to Pet. for Cert. 67.

[3] Rule 501 provides as follows: "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law."

[4] See Illinois Mental Health and Developmental Disabilities Confidentiality Act, Ill. Comp. Stat., ch. 740, §§ 110/1–110/17 (1994).

The Court of Appeals qualified its recognition of the privilege by stating that it would not apply if, "in the interests of justice, the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests." *Id.*, at 1357. Balancing those conflicting interests, the court observed, on the one hand, that the evidentiary need for the contents of the confidential conversations was diminished in this case because there were numerous eyewitnesses to the shooting, and, on the other hand, that Officer Redmond's privacy interests were substantial.[5] *Id.*, at 1358. Based on this assessment, the court concluded that the trial court had erred by refusing to afford protection to the confidential communications between Redmond and Beyer.

The United States Courts of Appeals do not uniformly agree that the federal courts should recognize a psychotherapist privilege under Rule 501. Compare *In re Doe*, 964 F. 2d 1325 (CA2 1992) (recognizing privilege); *In re Zuniga*, 714 F. 2d 632 (CA6) (same), cert. denied, 464 U. S. 983 (1983), with *United States* v. *Burtrum*, 17 F. 3d 1299 (CA10) (declining to recognize privilege), cert. denied, 513 U. S. 863 (1994); *In re Grand Jury Proceedings*, 867 F. 2d 562 (CA9) (same), cert. denied *sub nom. Doe* v. *United States*, 493 U. S. 906 (1989); *United States* v. *Corona*, 849 F. 2d 562 (CA11 1988) (same), cert. denied, 489 U. S. 1084 (1989); *United States* v. *Meagher*, 531 F. 2d 752 (CA5) (same), cert. denied, 429 U. S. 853 (1976). Because of the conflict among the Courts of

---

[5] "Her ability, through counseling, to work out the pain and anguish undoubtedly caused by Allen's death in all probability depended to a great deal upon her trust and confidence in her counselor Karen Beyer. Officer Redmond, and all those placed in her most unfortunate circumstances, are entitled to be protected in their desire to seek counseling after mortally wounding another human being in the line of duty. An individual who is troubled as the result of her participation in a violent and tragic event, such as this, displays a most commendable respect for human life and is a person well-suited 'to protect and to serve.'" 51 F. 3d, at 1358.

Appeals and the importance of the question, we granted certiorari. 516 U. S. 930 (1995). We affirm.

## II

Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting "common law principles . . . in the light of reason and experience." The authors of the Rule borrowed this phrase from our opinion in *Wolfle* v. *United States*, 291 U. S. 7, 12 (1934),[6] which in turn referred to the oft-repeated observation that "the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Funk* v. *United States*, 290 U. S. 371, 383 (1933). See also *Hawkins* v. *United States*, 358 U. S. 74, 79 (1958) (changes in privileges may be "dictated by 'reason and experience' "). The Senate Report accompanying the 1975 adoption of the Rules indicates that Rule 501 "should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship . . . should be determined on a case-by-case basis." S. Rep. No. 93–1277, p. 13 (1974).[7] The Rule thus

---

[6] "[T]he rules governing the competence of witnesses in criminal trials in the federal courts are not necessarily restricted to those local rules in force at the time of the admission into the Union of the particular state where the trial takes place, but are governed by common law principles as interpreted and applied by the federal courts in the light of reason and experience. *Funk* v. *United States*, 290 U. S. 371." *Wolfle* v. *United States*, 291 U. S., at 12–13.

[7] In 1972 the Chief Justice transmitted to Congress proposed Rules of Evidence for United States Courts and Magistrates. 56 F. R. D. 183 (hereinafter Proposed Rules). The Rules had been formulated by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Judicial Conference of the United States and by this Court. *Trammel* v. *United States*, 445 U. S. 40, 47 (1980). The Proposed Rules defined nine specific testimonial privileges, including a psychotherapist-patient privilege, and indicated that these were to be the exclusive privileges absent constitutional mandate, Act of Congress, or revision of the Rules. Proposed Rules 501–513, 56 F. R. D., at 230–261. Congress rejected this recommendation in favor of Rule 501's general mandate. *Trammel,* 445 U. S., at 47.

did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to "continue the evolutionary development of testimonial privileges." *Trammel* v. *United States,* 445 U. S. 40, 47 (1980); see also *University of Pennsylvania* v. *EEOC,* 493 U. S. 182, 189 (1990).

The common-law principles underlying the recognition of testimonial privileges can be stated simply. "'For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'" *United States* v. *Bryan,* 339 U. S. 323, 331 (1950) (quoting 8 J. Wigmore, Evidence §2192, p. 64 (3d ed. 1940)).[8] See also *United States* v. *Nixon,* 418 U. S. 683, 709 (1974). Exceptions from the general rule disfavoring testimonial privileges may be justified, however, by a "'public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel,* 445 U. S., at 50 (quoting *Elkins* v. *United States,* 364 U. S. 206, 234 (1960) (Frankfurter, J., dissenting)).

Guided by these principles, the question we address today is whether a privilege protecting confidential communications between a psychotherapist and her patient "promotes sufficiently important interests to outweigh the need for

---

[8] The familiar expression "every man's evidence" was a well-known phrase as early as the mid-18th century. Both the Duke of Argyll and Lord Chancellor Hardwicke invoked the maxim during the May 25, 1742, debate in the House of Lords concerning a bill to grant immunity to witnesses who would give evidence against Sir Robert Walpole, first Earl of Orford. 12 T. Hansard, Parliamentary History of England 643, 675, 693, 697 (1812). The bill was defeated soundly. *Id.,* at 711.

probative evidence . . . ." 445 U. S., at 51. Both "reason and experience" persuade us that it does.

## III

Like the spousal and attorney-client privileges, the psychotherapist-patient privilege is "rooted in the imperative need for confidence and trust." *Ibid.* Treatment by a physician for physical ailments can often proceed successfully on the basis of a physical examination, objective information supplied by the patient, and the results of diagnostic tests. Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.[9] As the Judicial Conference Advisory Committee observed in 1972 when it recommended that Congress recognize a psychotherapist privilege as part of the Proposed Federal Rules of Evidence, a psychiatrist's ability to help her patients

> " 'is completely dependent upon [the patients'] willingness and ability to talk freely. This makes it difficult if not impossible for [a psychiatrist] to function without being able to assure . . . patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule . . . , there is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment.' " Advisory Committee's

---

[9] See studies and authorities cited in the Brief for American Psychiatric Association et al. as *Amici Curiae* 14–17 and the Brief for American Psychological Association as *Amicus Curiae* 12–17.

Notes to Proposed Rules, 56 F. R. D. 183, 242 (1972) (quoting Group for Advancement of Psychiatry, Report No. 45, Confidentiality and Privileged Communication in the Practice of Psychiatry 92 (June 1960)).

By protecting confidential communications between a psychotherapist and her patient from involuntary disclosure, the proposed privilege thus serves important private interests.

Our cases make clear that an asserted privilege must also "serv[e] public ends." *Upjohn Co.* v. *United States*, 449 U. S. 383, 389 (1981). Thus, the purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Ibid.* And the spousal privilege, as modified in *Trammel*, is justified because it "furthers the important public interest in marital harmony," 445 U. S., at 53. See also *United States* v. *Nixon*, 418 U. S., at 705; *Wolfle* v. *United States*, 291 U. S., at 14. The psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance.[10]

In contrast to the significant public and private interests supporting recognition of the privilege, the likely evidentiary benefit that would result from the denial of the privilege is modest. If the privilege were rejected, confidential conver-

---

[10] This case amply demonstrates the importance of allowing individuals to receive confidential counseling. Police officers engaged in the dangerous and difficult tasks associated with protecting the safety of our communities not only confront the risk of physical harm but also face stressful circumstances that may give rise to anxiety, depression, fear, or anger. The entire community may suffer if police officers are not able to receive effective counseling and treatment after traumatic incidents, either because trained officers leave the profession prematurely or because those in need of treatment remain on the job.

sations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation. Without a privilege, much of the desirable evidence to which litigants such as petitioner seek access—for example, admissions against interest by a party—is unlikely to come into being. This unspoken "evidence" will therefore serve no greater truth-seeking function than if it had been spoken and privileged.

That it is appropriate for the federal courts to recognize a psychotherapist privilege under Rule 501 is confirmed by the fact that all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege.[11] We have previously observed that the policy decisions of the States bear on the question whether federal courts should

[11] Ala. Code § 34–26–2 (1975); Alaska Rule Evid. 504; Ariz. Rev. Stat. Ann. § 32–2085 (1992); Ark. Rule Evid. 503; Cal. Evid. Code Ann. §§ 1010, 1012, 1014 (West 1995); Colo. Rev. Stat. § 13–90–107(g) (Supp. 1995); Conn. Gen. Stat. § 52–146c (1995); Del. Uniform Rule Evid. 503; D. C. Code Ann. § 14–307 (1995); Fla. Stat. § 90.503 (Supp. 1992); Ga. Code Ann. § 24–9–21 (1995); Haw. Rules Evid. 504, 504.1; Idaho Rule Evid. 503; Ill. Comp. Stat., ch. 225, § 15/5 (1994); Ind. Code § 25–33–1–17 (1993); Iowa Code § 622.10 (1987); Kan. Stat. Ann. § 74–5323 (1985); Ky. Rule Evid. 507; La. Code Evid. Ann., Art. 510 (West 1995); Me. Rule Evid. 503; Md. Cts. & Jud. Proc. Code Ann. § 9–109 (1995); Mass. Gen. Laws § 233:20B (1995); Mich. Comp. Laws Ann. § 333.18237 (West Supp. 1996); Minn. Stat. § 595.02 (1988 and Supp. 1996); Miss. Rule Evid. 503; Mo. Rev. Stat. § 491.060 (1994); Mont. Code Ann. § 26–1–807 (1994); Neb. Rev. Stat. § 27–504 (1995); Nev. Rev. Stat. § 49.215 (1993); N. H. Rule Evid. 503; N. J. Stat. Ann. § 45:14B–28 (West 1995); N. M. Rule Evid. 11–504; N. Y. Civ. Prac. Law § 4507 (McKinney 1992); N. C. Gen. Stat. § 8–53.3 (Supp. 1995); N. D. Rule Evid. § 503; Ohio Rev. Code Ann. § 2317.02 (1995); Okla. Stat., Tit. 12, § 2503 (1991); Ore. Rules Evid. 504, 504.1; 42 Pa. Cons. Stat. § 5944 (1982); R. I. Gen. Laws §§ 5–37.3–3, 5–37.3–4 (1995); S. C. Code Ann. § 19–11–95 (Supp. 1995); S. D. Codified Laws §§ 19–13–6 to 19–13–11 (1995); Tenn. Code Ann. § 24–1–207 (1980); Tex. Rules Civ. Evid. 509, 510; Utah Rule Evid. 506; Vt. Rule Evid. 503; Va. Code Ann. § 8.01–400.2 (1992); Wash. Rev. Code § 18.83.110 (1994); W. Va. Code § 27–3–1 (1992); Wis. Stat. § 905.04 (1993–1994); Wyo. Stat. § 33–27–123 (Supp. 1995).

recognize a new privilege or amend the coverage of an existing one. See *Trammel*, 445 U. S., at 48–50; *United States* v. *Gillock*, 445 U. S. 360, 368, n. 8 (1980). Because state legislatures are fully aware of the need to protect the integrity of the factfinding functions of their courts, the existence of a consensus among the States indicates that "reason and experience" support recognition of the privilege. In addition, given the importance of the patient's understanding that her communications with her therapist will not be publicly disclosed, any State's promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a federal court.[12] Denial of the federal privilege therefore would frustrate the purposes of the state legislation that was enacted to foster these confidential communications.

It is of no consequence that recognition of the privilege in the vast majority of States is the product of legislative action rather than judicial decision. Although common-law rulings may once have been the primary source of new developments in federal privilege law, that is no longer the case. In *Funk* v. *United States*, 290 U. S. 371 (1933), we recognized that it is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both "reason" and "experience." *Id.*, at 376–381. That rule is properly respectful of the States and at the same time reflects the fact that once a state legislature has enacted a privilege there is no longer an opportunity for common-law creation of the protection. The history of the psychotherapist privilege illustrates the latter point. In 1972 the members of the

---

[12] At the outset of their relationship, the ethical therapist must disclose to the patient "the relevant limits on confidentiality." See American Psychological Association, Ethical Principles of Psychologists and Code of Conduct, Standard 5.01 (Dec. 1992). See also National Federation of Societies for Clinical Social Work, Code of Ethics V(a) (May 1988); American Counseling Association, Code of Ethics and Standards of Practice A.3.a (effective July 1995).

Judicial Conference Advisory Committee noted that the common law "had indicated a disposition to recognize a psychotherapist-patient privilege when legislatures began moving into the field." Proposed Rules, 56 F. R. D., at 242 (citation omitted). The present unanimous acceptance of the privilege shows that the state lawmakers moved quickly. That the privilege may have developed faster legislatively than it would have in the courts demonstrates only that the States rapidly recognized the wisdom of the rule as the field of psychotherapy developed.[18]

The uniform judgment of the States is reinforced by the fact that a psychotherapist privilege was among the nine specific privileges recommended by the Advisory Committee in its proposed privilege rules. In *United States* v. *Gillock*, 445 U. S., at 367–368, our holding that Rule 501 did not include a state legislative privilege relied, in part, on the fact that no such privilege was included in the Advisory Commit-

---

[18] Petitioner acknowledges that all 50 state legislatures favor a psychotherapist privilege. She nevertheless discounts the relevance of the state privilege statutes by pointing to divergence among the States concerning the types of therapy relationships protected and the exceptions recognized. A small number of state statutes, for example, grant the privilege only to psychiatrists and psychologists, while most apply the protection more broadly. Compare Haw. Rules Evid. 504, 504.1 and N. D. Rule Evid. 503 (privilege extends to physicians and psychotherapists), with Ariz. Rev. Stat. Ann. § 32–3283 (1992) (privilege covers "behavioral health professional[s]"); Tex. Rule Civ. Evid. 510(a)(1) (privilege extends to persons "licensed or certified by the State of Texas in the diagnosis, evaluation or treatment of any mental or emotional disorder" or "involved in the treatment or examination of drug abusers"); Utah Rule Evid. 506 (privilege protects confidential communications made to marriage and family therapists, professional counselors, and psychiatric mental health nurse specialists). The range of exceptions recognized by the States is similarly varied. Compare Ark. Code Ann. § 17–46–107 (1987) (narrow exceptions); Haw. Rules Evid. 504, 504.1 (same), with Cal. Evid. Code Ann. §§ 1016–1027 (West 1995) (broad exceptions); R. I. Gen. Laws § 5–37.3–4 (1995) (same). These variations in the scope of the protection are too limited to undermine the force of the States' unanimous judgment that some form of psychotherapist privilege is appropriate.

tee's draft. The reasoning in *Gillock* thus supports the opposite conclusion in this case. In rejecting the proposed draft that had specifically identified each privilege rule and substituting the present more open-ended Rule 501, the Senate Judiciary Committee explicitly stated that its action "should not be understood as disapproving any recognition of a psychiatrist-patient . . . privileg[e] contained in the [proposed] rules." S. Rep. No. 93–1277, at 13.

Because we agree with the judgment of the state legislatures and the Advisory Committee that a psychotherapist-patient privilege will serve a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth," *Trammel*, 445 U. S., at 50, we hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence.[14]

## IV

All agree that a psychotherapist privilege covers confidential communications made to licensed psychiatrists and psychologists. We have no hesitation in concluding in this case that the federal privilege should also extend to confidential communications made to licensed social workers in the course of psychotherapy. The reasons for recognizing a privilege for treatment by psychiatrists and psychologists apply with equal force to treatment by a clinical social worker such as Karen Beyer.[15] Today, social workers pro-

---

[14] Like other testimonial privileges, the patient may of course waive the protection.

[15] If petitioner had filed her complaint in an Illinois state court, respondents' claim of privilege would surely have been upheld, at least with respect to the state wrongful-death action. An Illinois statute provides that conversations between a therapist and her patients are privileged from compelled disclosure in any civil or criminal proceeding. Ill. Comp. Stat., ch. 740, § 110/10 (1994). The term "therapist" is broadly defined to encompass a number of licensed professionals including social work-

vide a significant amount of mental health treatment. See, *e. g.,* U. S. Dept. of Health and Human Services, Center for Mental Health Services, Mental Health, United States, 1994, pp. 85–87, 107–114; Brief for National Association of Social Workers et al. as *Amici Curiae* 5–7 (citing authorities). Their clients often include the poor and those of modest means who could not afford the assistance of a psychiatrist or psychologist, *id.,* at 6–7 (citing authorities), but whose counseling sessions serve the same public goals.[16] Perhaps in recognition of these circumstances, the vast majority of States explicitly extend a testimonial privilege to licensed

---

ers. Ch. 740, § 110/2. Karen Beyer, having satisfied the strict standards for licensure, qualifies as a clinical social worker in Illinois. 51 F. 3d 1346, 1358, n. 19 (CA7 1995).

Indeed, if only a state-law claim had been asserted in federal court, the second sentence in Rule 501 would have extended the privilege to that proceeding. We note that there is disagreement concerning the proper rule in cases such as this in which both federal and state claims are asserted in federal court and relevant evidence would be privileged under state law but not under federal law. See C. Wright & K. Graham, 23 Federal Practice and Procedure § 5434 (1980). Because the parties do not raise this question and our resolution of the case does not depend on it, we express no opinion on the matter.

[16] The Judicial Conference Advisory Committee's proposed psychotherapist privilege defined psychotherapists as psychologists and medical doctors who provide mental health services. Proposed Rules, 56 F. R. D., at 240. This limitation in the 1972 recommendation does not counsel against recognition of a privilege for social workers practicing psychotherapy. In the quarter century since the Committee adopted its recommendations, much has changed in the domains of social work and psychotherapy. See generally Brief for National Association of Social Workers et al. as *Amici Curiae* 5–13 (and authorities cited). While only 12 States regulated social workers in 1972, all 50 do today. See American Association of State Social Work Boards, Social Work Laws and Board Regulations: A State Comparison Study 29, 31 (1996). Over the same period, the relative portion of therapeutic services provided by social workers has increased substantially. See U. S. Dept. of Health and Human Services, Center for Mental Health Services, Mental Health, United States, 1994, pp. 85–87, 107–114.

social workers.[17]   We therefore agree with the Court of
Appeals that "[d]rawing a distinction between the counsel-
ing provided by costly psychotherapists and the counseling
provided by more readily accessible social workers serves
no discernible public purpose."   51 F. 3d, at 1358, n. 19.

We part company with the Court of Appeals on a separate
point.   We reject the balancing component of the privilege
implemented by that court and a small number of States.[18]
Making the promise of confidentiality contingent upon a trial
judge's later evaluation of the relative importance of the pa-
tient's interest in privacy and the evidentiary need for disclo-
sure would eviscerate the effectiveness of the privilege.   As

[17] See Ariz. Rev. Stat. Ann. § 32–3283 (1992); Ark. Code Ann. § 17–46–107
(1995); Cal. Evid. Code Ann. §§ 1010, 1012, 1014 (West 1995); Colo. Rev.
Stat. § 13–90–107 (1987); Conn. Gen. Stat. § 52–146q (1995); Del. Code Ann.,
Tit. 24, § 3913 (1987); D. C. Code Ann. § 14–307 (1995); Fla. Stat. § 90.503
(1991); Ga. Code Ann. § 24–9–21 (1995); Idaho Code § 54–3213 (1994); Ill.
Comp. Stat., ch. 225, § 20/16 (1994); Ind. Code § 25–23.6–6–1 (1993); Iowa
Code § 622.10 (1987); Kan. Stat. Ann. § 65–6315 (Supp. 1990); Ky. Rule
Evid. 507; La. Code Evid. Ann., Art. 510 (West 1995); Me. Rev. Stat.
Ann., Tit. 32, § 7005 (1988); Md. Cts. & Jud. Proc. Code Ann. § 9–121 (1995);
Mass. Gen. Laws § 112:135A (1994); Mich. Comp. Laws Ann. § 339.1610
(West 1992); Minn. Stat. § 595.02(g) (1994); Miss. Code Ann. § 73–53–29
(1995); Mo. Rev. Stat. § 337.636 (Supp. 1996); Mont. Code Ann. § 37–22–401
(1995); Neb. Rev. Stat. § 71–1,335 (1995); Nev. Rev. Stat. §§ 49.215, 49.225,
49.235 (1993); N. H. Rev. Stat. Ann. § 330–A:19 (1995); N. J. Stat. Ann.
§ 45:15BB–13 (West 1995); N. M. Stat. Ann. § 61–31–24 (Supp. 1995); N. Y.
Civ. Prac. Law § 4508 (McKinney 1992); N. C. Gen. Stat. § 8–53.7 (1986);
Ohio Rev. Code Ann. § 2317.02 (1995); Okla. Stat., Tit. 59, § 1261.6 (1991);
Ore. Rev. Stat. § 40.250 (1991); R. I. Gen. Laws §§ 5–37.3–3, 5–37.3–4
(1995); S. C. Code Ann. § 19–11–95 (Supp. 1995); S. D. Codified Laws § 36–
26–30 (1994); Tenn. Code Ann. § 63–23–107 (1990); Tex. Rule Civ. Evid.
510; Utah Rule Evid. 506; Vt. Rule Evid. 503; Va. Code Ann. § 8.01–400.2
(1992); Wash. Rev. Code § 18.19.180 (1994); W. Va. Code § 30–30–12 (1993);
Wis. Stat. § 905.04 (1993–1994); Wyo. Stat. § 33–38–109 (Supp. 1995).

[18] See, e. g., Me. Rev. Stat. Ann., Tit. 32, § 7005 (1964); N. H. Rev. Stat.
Ann. § 330–A:19 (1995); N. C. Gen. Stat. § 8–53.7 (1986); Va. Code Ann.
§ 8.01–400.2 (1992).

18

we explained in *Upjohn*, if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." 449 U. S., at 393.

These considerations are all that is necessary for decision of this case. A rule that authorizes the recognition of new privileges on a case-by-case basis makes it appropriate to define the details of new privileges in a like manner. Because this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary nor feasible to delineate its full contours in a way that would "govern all conceivable future questions in this area." *Id.*, at 386.[19]

## V

The conversations between Officer Redmond and Karen Beyer and the notes taken during their counseling sessions are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins as to Part III, dissenting.

The Court has discussed at some length the benefit that will be purchased by creation of the evidentiary privilege in this case: the encouragement of psychoanalytic counseling. It has not mentioned the purchase price: occasional injustice. That is the cost of every rule which excludes reliable and

---

[19] Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

probative evidence—or at least every one categorical enough to achieve its announced policy objective. In the case of some of these rules, such as the one excluding confessions that have not been properly "Mirandized," see *Miranda* v. *Arizona*, 384 U. S. 436 (1966), the victim of the injustice is always the impersonal State or the faceless "public at large." For the rule proposed here, the victim is more likely to be some individual who is prevented from proving a valid claim—or (worse still) prevented from establishing a valid defense. The latter is particularly unpalatable for those who love justice, because it causes the courts of law not merely to let stand a wrong, but to become themselves the instruments of wrong.

In the past, this Court has well understood that the particular value the courts are distinctively charged with preserving—justice—is severely harmed by contravention of "the fundamental principle that '"the public . . . has a right to every man's evidence."'" *Trammel* v. *United States*, 445 U. S. 40, 50 (1980) (citation omitted). Testimonial privileges, it has said, *"are not lightly created nor expansively construed,* for they are in derogation of the search for truth." *United States* v. *Nixon*, 418 U. S. 683, 710 (1974) (emphasis added). Adherence to that principle has caused us, in the Rule 501 cases we have considered to date, to reject new privileges, see *University of Pennsylvania* v. *EEOC*, 493 U. S. 182 (1990) (privilege against disclosure of academic peer review materials); *United States* v. *Gillock*, 445 U. S. 360 (1980) (privilege against disclosure of "legislative acts" by member of state legislature), and even to construe narrowly the scope of existing privileges, see, *e. g., United States* v. *Zolin*, 491 U. S. 554, 568–570 (1989) (permitting *in camera* review of documents alleged to come within crime-fraud exception to attorney-client privilege); *Trammel, supra* (holding that voluntary testimony by spouse is not covered by husband-wife privilege). The Court today ignores this traditional judicial preference for the truth, and ends up creat-

ing a privilege that is new, vast, and ill defined. I respectfully dissent.

## I

The case before us involves confidential communications made by a police officer to a state-licensed clinical social worker in the course of psychotherapeutic counseling. Before proceeding to a legal analysis of the case, I must observe that the Court makes its task deceptively simple by the manner in which it proceeds. It begins by characterizing the issue as "whether it is appropriate for federal courts to recognize a 'psychotherapist privilege,'" *ante*, at 4, and devotes almost all of its opinion to that question. Having answered that question (to its satisfaction) in the affirmative, it then devotes *less than a page of text* to answering in the affirmative the small remaining question whether "the federal privilege should also extend to confidential communications made to licensed social workers in the course of psychotherapy," *ante*, at 15.

Of course the prototypical evidentiary privilege analogous to the one asserted here—the lawyer-client privilege—is not identified by the broad area of advice giving practiced by the person to whom the privileged communication is given, but rather by the *professional status* of that person. Hence, it seems a long step from a lawyer-client privilege to a tax advisor-client or accountant-client privilege. But if one recharacterizes it as a "legal advisor" privilege, the extension seems like the most natural thing in the world. That is the illusion the Court has produced here: It first frames an overly general question ("Should there be a psychotherapist privilege?") that can be answered in the negative only by excluding from protection office consultations with professional psychiatrists (*i. e.*, doctors) and clinical psychologists. And then, having answered that in the affirmative, it comes to the *only* question that the facts of this case present ("Should there be a social worker-client privilege with regard to psychotherapeutic counseling?") with the answer

seemingly a foregone conclusion. At that point, to conclude against the privilege one must subscribe to the difficult proposition, "Yes, there is a psychotherapist privilege, but not if the psychotherapist is a social worker."

Relegating the question actually posed by this case to an afterthought makes the impossible possible in a number of wonderful ways. For example, it enables the Court to treat the Proposed Federal Rules of Evidence developed in 1972 by the Judicial Conference Advisory Committee as strong support for its holding, whereas they in fact counsel clearly and directly against it. The Committee did indeed recommend a "psychotherapist privilege" of sorts; but more precisely, and more relevantly, it recommended a privilege for psychotherapy conducted by "a person authorized to practice medicine" or "a person licensed or certified as a psychologist," Proposed Rule of Evidence 504, 56 F. R. D. 183, 240 (1972), which is to say that *it recommended against the privilege at issue here.* That condemnation is obscured, and even converted into an endorsement, by pushing a "psychotherapist privilege" into the center ring. The Proposed Rule figures prominently in the Court's explanation of why that privilege deserves recognition, *ante,* at 13–15, and is ignored in the single page devoted to the sideshow which happens to be the issue presented for decision, *ante,* at 15–16.

This is the most egregious and readily explainable example of how the Court's misdirection of its analysis makes the difficult seem easy; others will become apparent when I give the social-worker question the fuller consideration it deserves. My initial point, however, is that the Court's very methodology—giving serious consideration only to the more general, and much easier, question—is in violation of our duty to proceed cautiously when erecting barriers between us and the truth.

## II

To say that the Court devotes the bulk of its opinion to the much easier question of psychotherapist-patient privilege is

not to say that its answer to that question is convincing. At bottom, the Court's decision to recognize such a privilege is based on its view that "successful [psychotherapeutic] treatment" serves "important private interests" (namely, those of patients undergoing psychotherapy) as well as the "public good" of "[t]he mental health of our citizenry." *Ante*, at 10–11. I have no quarrel with these premises. Effective psychotherapy undoubtedly is beneficial to individuals with mental problems, and surely serves some larger social interest in maintaining a mentally stable society. But merely mentioning these values does not answer the critical question: Are they of such importance, and is the contribution of psychotherapy to them so distinctive, and is the application of normal evidentiary rules so destructive to psychotherapy, as to justify making our federal courts occasional instruments of injustice? On that central question I find the Court's analysis insufficiently convincing to satisfy the high standard we have set for rules that "are in derogation of the search for truth." *Nixon*, 418 U. S., at 710.

When is it, one must wonder, that *the psychotherapist* came to play such an indispensable role in the maintenance of the citizenry's mental health? For most of history, men and women have worked out their difficulties by talking to, *inter alios*, parents, siblings, best friends, and bartenders—none of whom was awarded a privilege against testifying in court. Ask the average citizen: Would your mental health be more significantly impaired by preventing you from seeing a psychotherapist, or by preventing you from getting advice from your mom? I have little doubt what the answer would be. Yet there is no mother-child privilege.

How likely is it that a person will be deterred from seeking psychological counseling, or from being completely truthful in the course of such counseling, because of fear of later disclosure in litigation? And even more pertinent to today's decision, to what extent will the evidentiary privilege reduce that deterrent? The Court does not try to answer the first of

these questions; and it *cannot possibly have any notion* of what the answer is to the second, since that depends entirely upon the scope of the privilege, which the Court amazingly finds it "neither necessary nor feasible to delineate," *ante*, at 18. If, for example, the psychotherapist can give the patient no more assurance than "A court will not be able to make me disclose what you tell me, unless you tell me about a harmful act," I doubt whether there would be much benefit from the privilege at all. That is not a fanciful example, at least with respect to extension of the psychotherapist privilege to social workers. See Del. Code Ann., Tit. 24, § 3913(2) (1987); Idaho Code § 54–3213(2) (1994).

Even where it is certain that absence of the psychotherapist privilege will inhibit disclosure of the information, it is not clear to me that that is an unacceptable state of affairs. Let us assume the very worst in the circumstances of the present case: that to be truthful about what was troubling her, the police officer who sought counseling would have to confess that she shot without reason, and wounded an innocent man. If (again to assume the worst) such an act constituted the crime of negligent wounding under Illinois law, the officer would of course have the absolute right not to admit that she shot without reason in criminal court. But I see no reason why she should be enabled *both* not to admit it in criminal court (as a good citizen should), *and* to get the benefits of psychotherapy by admitting it to a therapist who cannot tell anyone else. And even less reason why she should be enabled to *deny* her guilt in the criminal trial—or in a civil trial for negligence—while yet obtaining the benefits of psychotherapy by confessing guilt to a social worker who cannot testify. It seems to me entirely fair to say that if she wishes the benefits of telling the truth she must also accept the adverse consequences. To be sure, in most cases the statements to the psychotherapist will be only marginally relevant, and one of the purposes of the privilege (though not one relied upon by the Court) may be simply to spare

patients needless intrusion upon their privacy, and to spare psychotherapists needless expenditure of their time in deposition and trial. But surely this can be achieved by means short of excluding even evidence that is of the most direct and conclusive effect.

The Court confidently asserts that not much truth-finding capacity would be destroyed by the privilege anyway, since "[w]ithout a privilege, much of the desirable evidence to which litigants such as petitioner seek access . . . is unlikely to come into being." *Ante*, at 12. If that is so, how come psychotherapy got to be a thriving practice before the "psychotherapist privilege" was invented? Were the patients paying money to lie to their analysts all those years? Of course the evidence-generating effect of the privilege (if any) depends entirely upon its scope, which the Court steadfastly declines to consider. And even if one assumes that scope to be the broadest possible, is it really true that most, or even many, of those who seek psychological counseling have the worry of litigation in the back of their minds? I doubt that, and the Court provides no evidence to support it.

The Court suggests one last policy justification: since psychotherapist privilege statutes exist in all the States, the failure to recognize a privilege in federal courts "would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Ante*, at 13. This is a novel argument indeed. A sort of inverse preemption: The truth-seeking functions of *federal* courts must be adjusted so as not to conflict with the policies *of the States*. This reasoning cannot be squared with *Gillock*, which declined to recognize an evidentiary privilege for Tennessee legislators in federal prosecutions, even though the Tennessee Constitution guaranteed it in state criminal proceedings. *Gillock*, 445 U. S., at 368. Moreover, since, as I shall discuss, state policies regarding the psychotherapist privilege vary considerably from State to State, *no* uniform federal policy can possibly honor most of them. If further-

ance of state policies is the name of the game, rules of privilege in federal courts should vary from State to State, à la *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938).

The Court's failure to put forward a convincing justification of its own could perhaps be excused if it were relying upon the unanimous conclusion of state courts in the reasoned development of their common law. It cannot do that, since *no* State has such a privilege apart from legislation.[1]

---

[1] The Court observes: "In 1972 the members of the Judicial Conference Advisory Committee noted that the common law 'had indicated a disposition to recognize a psychotherapist-patient privilege when legislatures began moving into the field.' Proposed Rules, 56 F. R. D., at 242 (citation omitted)." *Ante,* at 13–14. The sole support the Committee invoked was a student Note entitled Confidential Communications to a Psychotherapist: A New Testimonial Privilege, 47 Nw. U. L. Rev. 384 (1952). That source, in turn, cites (and discusses) a single case recognizing a common-law psychotherapist privilege: the unpublished opinion of a judge of the Circuit Court of Cook County, Illinois, *Binder* v. *Ruvell,* No. 52–C–2535 (June 24, 1952)—which, in turn, cites no other cases.

I doubt whether the Court's failure to provide more substantial support for its assertion stems from want of trying. Respondents and all of their *amici* pointed us to only four other state-court decisions supposedly adopting a common-law psychotherapist privilege. See Brief for American Psychiatric Association et al. as *Amici Curiae* 8, n. 5; Brief for American Psychoanalytic Association et al. as *Amici Curiae* 15–16; Brief for American Psychological Association as *Amicus Curiae* 8. It is not surprising that the Court thinks it not worth the trouble to cite them: (1) In *In re "B,"* 482 Pa. 471, 394 A. 2d 419 (1978), the opinions of four of the seven justices *explicitly rejected* a nonstatutory privilege; and the two justices who did recognize one recognized, not a common-law privilege, but rather *(mirabile dictu)* a privilege "constitutionally based," "emanat[ing] from the penumbras of the various guarantees of the Bill of Rights, . . . as well as from the guarantees of the Constitution of this Commonwealth." *Id.,* at 484, 394 A. 2d, at 425. (2) *Allred* v. *State,* 554 P. 2d 411 (Alaska 1976), held that no privilege was available in the case before the court, so what it says about the existence of a common-law privilege is the purest dictum. (3) *Falcon* v. *Alaska Pub. Offices Comm'n,* 570 P. 2d 469 (1977), a later Alaska Supreme Court case, proves the last statement. It *rejected* the claim by a physician that he did not have to disclose the names of his patients, even though some of the physician's practice consisted of psycho-

26

What it relies upon, instead, is "the fact that all 50 States and the District of Columbia have [1] *enacted into law* [2] *some form* of psychotherapist privilege." *Ante,* at 12 (emphasis added). Let us consider both the verb and its object: The fact [1] that all 50 States have *enacted* this privilege argues not *for,* but *against,* our adopting the privilege judicially. At best it suggests that the matter has been found not to lend itself to judicial treatment—perhaps because the pros and cons of adopting the privilege, or of giving it one or another shape, are not that clear; or perhaps because the rapidly evolving uses of psychotherapy demand a flexibility that only legislation can provide. At worst it suggests that the privilege commends itself only to decisionmaking bodies in which reason is tempered, so to speak, by political pressure from organized interest groups (such as psychologists and social workers), and decisionmaking bodies that are not overwhelmingly concerned (as courts of law are and should be) with justice.

And the phrase [2] "some form of psychotherapist privilege" covers a multitude of difficulties. The Court concedes that there is "divergence among the States concerning the types of therapy relationships protected and the exceptions recognized." *Ante,* at 14, n. 13. To rest a newly announced federal common-law psychotherapist privilege, assertable

---

therapy; it made no mention of *Allred*'s dictum that there was a common-law psychiatrist-patient privilege (though if that existed it would seem relevant), and cited *Allred* only for the proposition that there was no *statutory* privilege, 570 P. 2d, at 473, n. 12. And finally, (4) *State* v. *Evans,* 104 Ariz. 434, 454 P. 2d 976 (1969), created a limited privilege, applicable to court-ordered examinations to determine competency to stand trial, *which tracked a privilege that had been legislatively created after the defendant's examination.*

In light of this dearth of case support—from all the courts of 50 States, down to the county-court level—it seems to me the Court's assertion should be revised to read: "The common law had indicated *scant* disposition to recognize a psychotherapist-patient privilege when *(or even after)* legislatures began moving into the field."

from this day forward in all federal courts, upon "the States' *unanimous judgment* that some form of psychotherapist privilege is appropriate," *ibid.* (emphasis added), is rather like announcing a new, immediately applicable, federal common law of torts, based upon the States' "unanimous judgment" that *some* form of tort law is appropriate. In the one case as in the other, the state laws vary to such a degree that the parties and lower federal judges confronted by the new "common law" have barely a clue as to what its content might be.

### III

Turning from the general question that was not involved in this case to the specific one that is: The Court's conclusion that a social-worker psychotherapeutic privilege deserves recognition is even less persuasive. In approaching this question, the fact that five of the state legislatures that have seen fit to enact "some form" of psychotherapist privilege have elected not to extend *any form* of privilege to social workers, see *ante*, at 17, n. 17, ought to give one pause. So should the fact that the Judicial Conference Advisory Committee was similarly discriminating in its conferral of the proposed Rule 504 privilege, see *supra*, at 21. The Court, however, has "no hesitation in concluding . . . that the federal privilege should also extend" to social workers, *ante*, at 15— and goes on to prove that by polishing off the reasoned analysis with a topic sentence and two sentences of discussion, as follows (omitting citations and nongermane footnote):

> "The reasons for recognizing a privilege for treatment by psychiatrists and psychologists apply with equal force to treatment by a clinical social worker such as Karen Beyer. Today, social workers provide a significant amount of mental health treatment. Their clients often include the poor and those of modest means who could not afford the assistance of a psychiatrist or psy-

28

chologist, but whose counseling sessions serve the same public goals." *Ante*, at 15–16.

So much for the rule that privileges are to be narrowly construed.

Of course this brief analysis—like the earlier, more extensive, discussion of the general psychotherapist privilege—contains no explanation of why the psychotherapy provided by social workers is a public good of such transcendent importance as to be purchased at the price of occasional injustice. Moreover, it considers only the respects in which social workers providing therapeutic services are *similar* to licensed psychiatrists and psychologists; not a word about the respects in which they are different. A licensed psychiatrist or psychologist is an expert in psychotherapy—and that may suffice (though I think it not so clear that this Court should make the judgment) to justify the use of extraordinary means to encourage counseling with him, as opposed to counseling with one's rabbi, minister, family, or friends. One must presume that a social worker does *not* bring this greatly heightened degree of skill to bear, which is alone a reason for not encouraging that consultation as generously. Does a social worker bring to bear at least a significantly heightened degree of skill—more than a minister or rabbi, for example? I have no idea, and neither does the Court. The social worker in the present case, Karen Beyer, was a "licensed clinical social worker" in Illinois, App. 18, a job title whose training requirements consist of a "master's degree in social work from an approved program," and "3,000 hours of satisfactory, supervised clinical professional experience." Ill. Comp. Stat., ch. 225, §20/9 (1994). It is not clear that the degree in social work requires *any* training in psychotherapy. The "clinical professional experience" apparently will impart some such training, but only of the vaguest sort, judging from the Illinois Code's definition of "[c]linical social work practice," viz., "the providing of mental health services for the evaluation, treatment, and prevention of mental and

emotional disorders in individuals, families and groups based on knowledge and theory of psychosocial development, behavior, psychopathology, unconscious motivation, interpersonal relationships, and environmental stress." Ch. 225, § 20/3(5). But the rule the Court announces today—like the Illinois evidentiary privilege which that rule purports to respect, ch. 225, § 20/16[2]—is not limited to "licensed clinical social workers," but includes all "licensed social worker[s]." "Licensed social worker[s]" may also provide "mental health services" as described in § 20/3(5), so long as it is done under supervision of a licensed clinical social worker. And the training requirement for a "licensed social worker" consists of either (a) "a degree from a graduate program of social work" approved by the State, or (b) "a degree in social work from an undergraduate program" approved by the State, plus "3 years of supervised professional experience." Ch. 225, § 20/9A. With due respect, it does not seem to me that any of this training is comparable in its rigor (or indeed in the precision of its subject) to the training of the other experts (lawyers) to whom this Court has accorded a privilege, or even of the experts (psychiatrists and psychologists) to whom the Advisory Committee and this Court proposed extension of a privilege in 1972. Of course these are only *Illinois'* requirements for "social workers." Those of

---

[2] Section 20/16 is the provision of the Illinois statutes cited by the Court to show that Illinois has "explicitly extend[ed] a testimonial privilege to licensed social workers." *Ante,* at 16–17, and n. 17. The Court elsewhere observes that Redmond's communications to Beyer would have been privileged in state court under another provision of the Illinois statutes, the Mental Health and Developmental Disabilities Confidentiality Act, Ill. Comp. Stat., ch. 740, § 110/10 (1994). *Ante,* at 15–16, n. 15. But the privilege conferred by § 110/10 extends to an even more ill-defined class: not only to *licensed* social workers, but to *all* social workers, to nurses, and indeed to "any other person not prohibited by law from providing [mental health or developmental disabilities] services or from holding himself out as a therapist if the recipient reasonably believes that such person is permitted to do so." Ch. 740, § 110/2.

other States, for all we know, may be even less demanding. Indeed, I am not even sure there is a nationally accepted definition of "social worker," as there is of psychiatrist and psychologist. It seems to me quite irresponsible to extend the so-called "psychotherapist privilege" to all licensed social workers, nationwide, without exploring these issues.

Another critical distinction between psychiatrists and psychologists, on the one hand, and social workers, on the other, is that the former professionals, in their consultations with patients, *do nothing but psychotherapy*. Social workers, on the other hand, interview people for a multitude of reasons. The Illinois definition of "[l]icensed social worker," for example, is as follows:

> "Licensed social worker" means a person who holds a license authorizing the practice of social work, which includes social services to individuals, groups or communities in any one or more of the fields of social casework, social group work, community organization for social welfare, social work research, social welfare administration or social work education." Ch. 225, § 20/3(9).

Thus, in applying the "social worker" variant of the "psychotherapist" privilege, it will be necessary to determine whether the information provided to the social worker was provided to him *in his capacity as a psychotherapist*, or in his capacity as an administrator of social welfare, a community organizer, etc. Worse still, if the privilege is to have its desired effect (and is not to mislead the client), it will presumably be necessary for the social caseworker to advise, as the conversation with his welfare client proceeds, which portions are privileged and which are not.

Having concluded its three sentences of reasoned analysis, the Court then invokes, as it did when considering the psychotherapist privilege, the "experience" of the States—once again an experience I consider irrelevant (if not counterindicative) because it consists entirely of legislation rather

than common-law decision. It says that "the vast majority of States explicitly extend a testimonial privilege to licensed social workers." *Ante*, at 16–17. There are two elements of this impressive statistic, however, that the Court does not reveal.

First—and utterly conclusive of the irrelevance of this supposed consensus to the question before us—the majority of the States that accord a privilege to social workers do *not* do so as a subpart of a "psychotherapist" privilege. The privilege applies to *all* confidences imparted to social workers, and not just those provided in the course of psychotherapy.[3] In Oklahoma, for example, the social-worker-privilege statute prohibits a licensed social worker from disclosing, or being compelled to disclose, "*any information* acquired from persons consulting the licensed social worker in his or her professional capacity" (with certain exceptions to be discussed *infra*, at 33). Okla. Stat., Tit. 59, § 1261.6 (1991) (emphasis added). The social worker's "professional capacity" is expansive, for the "[P]ractice of social work" in Oklahoma is defined as:

> "[T]he professional activity of helping individuals, groups, or communities enhance or restore their capacity for physical, social and economic functioning and the

---

[3] See Ariz. Rev. Stat. Ann. § 32–3283 (1992); Ark. Code Ann. § 17–46–107 (1995); Del. Code Ann., Tit. 24, § 3913 (1987); Idaho Code § 54–3213 (1994); Ind. Code § 25–23.6–6–1 (1993); Iowa Code §§ 154C.5 and 622.10 (1987); Kan. Stat. Ann. § 65–6315 (Supp. 1990); Me. Rev. Stat. Ann., Tit. 32, § 7005 (1988); Mass. Gen. Laws § 112:135A (1994); Mich. Comp. Laws Ann. § 339.1610 (West 1992); Miss. Code Ann. § 73–53–29 (1995); Mo. Rev. Stat. § 337.636 (1994); Mont. Code Ann. § 37–22–401 (1995); Neb. Rev. Stat. § 71–1,335. (Supp. 1994); N. J. Stat. Ann. § 45:15BB–13 (West 1995); N. M. Stat. Ann. § 61–31–24 (1993); N. Y. Civ. Prac. Law § 4508 (McKinney 1992); N. C. Gen. Stat. § 8–53.7 (1986); Ohio Rev. Code Ann. § 2317.02(G)(1) (1995); Okla. Stat., Tit. 59, § 1261.6 (1991); Ore. Rev. Stat. § 40.250 (1991); S. D. Codified Laws § 36–26–30 (1994); Tenn. Code Ann. § 63–23–107 (1990); Wash. Rev. Code § 18.19.180 (1994); W. Va. Code § 30–30–12 (1993); Wyo. Stat. § 33–38–109 (Supp. 1995).

professional application of social work values, principles and techniques in areas such as clinical social work, social service administration, social planning, social work consultation and social work research to one or more of the following ends: Helping people obtain tangible services; counseling with individuals, families and groups; helping communities or groups provide or improve social and health services; and participating in relevant social action. The practice of social work requires knowledge of human development and behavior; of social economic and cultural institutions and forces; and of the interaction of all of these factors. Social work practice includes the teaching of relevant subject matter and of conducting research into problems of human behavior and conflict." Tit. 59, § 1250.1(2).

Thus, in Oklahoma, as in most other States having a social-worker privilege, it is not a subpart or even a derivative of the psychotherapist privilege, but rather a piece of special legislation similar to that achieved by many other groups, from accountants, see, *e. g.,* Miss. Code Ann. § 73–33–16(2) (1995) (certified public accountant "shall not be required by any court of this state to disclose, and shall not voluntarily disclose," client information), to private detectives, see, *e. g.,* Mich. Comp. Laws § 338.840(2) (1979) ("Any communications . . . furnished by a professional man or client to a [licensed private detective], or any information secured in connection with an assignment for a client, shall be deemed privileged with the same authority and dignity as are other privileged communications recognized by the courts of this state").[4] These social-worker statutes give no support, therefore, to

---

[4] These ever-multiplying evidentiary-privilege statutes, which the Court today emulates, recall us to the original meaning of the word "privilege." It is a composite derived from the Latin words "privus" and "lex": private law.

the theory (importance of psychotherapy) upon which the Court rests its disposition.

Second, the Court does not reveal the enormous degree of disagreement among the States as to the scope of the privilege. It concedes that the laws of four States are subject to such gaping exceptions that they are "'little better than no privilege at all,'" *ante,* at 17, 18, and n. 18, so that they should more appropriately be categorized with the five States whose laws contradict the action taken today. I would add another State to those whose privilege is illusory. See Wash. Rev. Code § 18.19.180 (1994) (disclosure of information required "[i]n response to a subpoena from a court of law"). In adopting *any* sort of a social-worker privilege, then, the Court can at most claim that it is following the legislative "experience" of 40 States, and contradicting the "experience" of 10.

But turning to those States that do have an appreciable privilege of some sort, the diversity is vast. In Illinois and Wisconsin, the social-worker privilege does not apply when the confidential information pertains to homicide, see Ill. Comp. Stat., ch. 740, § 110/10(a)(9) (1994); Wis. Stat. § 905.04(4)(d) (1993–1994), and in the District of Columbia when it pertains to any crime "inflicting injuries" upon persons, see D. C. Code Ann. § 14–307(a)(1) (1995). In Missouri, the privilege is suspended as to information that pertains to a criminal act, see Mo. Rev. Stat. § 337.636(2) (1994), and in Texas when the information is sought in any criminal prosecution, compare Tex. Rule Civ. Evid. 510(d) with Tex. Rule Crim. Evid. 501 *et seq.* In Kansas and Oklahoma, the privilege yields when the information pertains to "violations of any law," see Kan. Stat. Ann. § 65–6315(a)(2) (Supp. 1990); Okla. Stat., Tit. 59, § 1261.6(2) (1991); in Indiana, when it reveals a "serious harmful act," see Ind. Code § 25–23.6–6–1(2) (1993); and in Delaware and Idaho, when it pertains to any "harmful act," see Del. Code Ann., Tit. 24, § 3913(2) (1987); Idaho Code § 54–3213(2) (1994). In Oregon, a state-

34

employed social worker like Karen Beyer loses the privilege where her supervisor determines that her testimony "is necessary in the performance of the duty of the social worker as a public employee." See Ore. Rev. Stat. § 40.250(5) (1991). In South Carolina, a social worker is forced to disclose confidences "when required by statutory law or by court order for good cause shown to the extent that the patient's care and treatment or the nature and extent of his mental illness or emotional condition are reasonably at issue in a proceeding." See S. C. Code Ann. § 19–11–95(D)(1) (Supp. 1995). The majority of social-worker-privilege States declare the privilege inapplicable to information relating to child abuse.[5] And the States that do not fall into any of the above categories provide exceptions for commitment proceedings, for proceedings in which the patient relies on his mental or emotional condition as an element of his claim or defense, or for communications made in the course of a court-ordered examination of the mental or emotional condition of the patient.[6]

---

[5] See, e. g., Ariz. Rev. Stat. Ann. § 32–3283 (1992); Ark. Code Ann. § 17–46–107(3) (1995); Cal. Evid. Code Ann. § 1027 (West 1995); Colo. Rev. Stat. § 19–3–304 (Supp. 1995); Del. Rule Evid. 503(d)(4); Ga. Code Ann. § 19–7–5(c)(1)(G) (1991); Idaho Code § 54–3213(3) (1994); La. Code Evid. Ann., Art. 510(B)(2)(k) (West 1995); Md. Cts. & Jud. Proc. Code Ann. § 9–121(e)(4) (1995); Mass. Gen. Laws § 119:51A (1994); Mich. Comp. Laws Ann. § 722.623 (West 1992 Supp. Pamph.); Minn. Stat. § 595.02.2(a) (1988); Miss. Code Ann. § 73–53–29(e) (1995); Mont. Code Ann. § 37–22–401(3) (1995); Neb. Rev. Stat. § 28–711 (1995); N. M. Stat. Ann. § 61–31–24(C) (Supp. 1995); N. Y. Civ. Prac. Law § 4508(a)(3) (McKinney 1992); Ohio Rev. Code Ann. § 2317.02(G)(1)(a) (1995); Ore. Rev. Stat. § 40.250(4) (1991); R. I. Gen. Laws § 5–37.3–4(b)(4) (1995); S. D. Codified Laws § 36–26–30(3) (1994); Tenn. Code Ann. § 63–23–107(b) (1990); Vt. Rule Evid. 503(d)(5); W. Va. Code § 30–30–12(a)(4) (1993); Wyo. Stat. § 14–3–205 (1994).

[6] See, e. g., Fla. Stat. § 90.503(4) (Supp. 1992) (all three exceptions); Ky. Rule Evid. 507(c) (all three); Nev. Rev. Stat. § 49.245 (1993) (all three); Utah Rule Evid. 506(d) (all three); Conn. Gen. Stat. § 52–146q(c)(1) (1995) (commitment proceedings and proceedings in which patient's mental condition at issue); Iowa Code § 622.10 (1987) (proceedings in which patient's mental condition at issue).

Thus, although the Court is technically correct that "the vast majority of States explicitly extend a testimonial privilege to licensed social workers," *ante*, at 16–17, that uniformity exists only at the most superficial level. No State has adopted the privilege without restriction; the nature of the restrictions varies enormously from jurisdiction to jurisdiction; and 10 States, I reiterate, effectively reject the privilege entirely. It is fair to say that there is scant national consensus even as to the propriety of a social-worker psychotherapist privilege, and none whatever as to its appropriate scope. In other words, the state laws to which the Court appeals for support demonstrate most convincingly that adoption of a social-worker psychotherapist privilege is a job for Congress.

\* \* \*

The question before us today is not whether there should be an evidentiary privilege for social workers providing therapeutic services. Perhaps there should. But the question before us is whether (1) the need for that privilege is so clear, and (2) the desirable contours of that privilege are so evident, that it is appropriate for this Court to craft it in common-law fashion, under Rule 501. Even if we were writing on a clean slate, I think the answer to that question would be clear. But given our extensive precedent to the effect that new privileges "in derogation of the search for truth" "are not lightly created," *United States* v. *Nixon*, 418 U. S., at 710, the answer the Court gives today is inexplicable.

In its consideration of this case, the Court was the beneficiary of no fewer than 14 *amicus* briefs supporting respondents, most of which came from such organizations as the American Psychiatric Association, the American Psychoanalytic Association, the American Association of State Social Work Boards, the Employee Assistance Professionals Association, Inc., the American Counseling Association, and the National Association of Social Workers. Not a single *ami-*

*cus* brief was filed in support of petitioner. That is no surprise. There is no self-interested organization out there devoted to pursuit of the truth in the federal courts. The expectation is, however, that *this Court* will have that interest prominently—indeed, primarily—in mind. Today we have failed that expectation, and that responsibility. It is no small matter to say that, in some cases, our federal courts will be the tools of injustice rather than unearth the truth where it is available to be found. The common law has identified a few instances where that is tolerable. Perhaps Congress may conclude that it is also tolerable for the purpose of encouraging psychotherapy by social workers. But that conclusion assuredly does not burst upon the mind with such clarity that a judgment in favor of suppressing the truth ought to be pronounced by this honorable Court. I respectfully dissent.