Theodore Morales SMITH, a minor, by and through his parents and natural guardians, Paek Morales SMITH and John Smith; and Paek Morales Smith and John Smith, in their own right, Plaintiffs,

v.

UNITED STATES of America, Defendants.

No. CIV.A. 98–606–RRM.

United States District Court, D. Delaware.

March 31, 2000.

Fraser and Roberts of the Judge Advocate General's ("JAG") Corps for the United States Air Force; (b) compel production of all documents and things contained within the government's Administrative Claim File pertaining to the care and treatment rendered to plaintiff, Paek Morales Smith, during her pregnancy with plaintiff, Theodore Morales Smith, at Dover Air Force Base in 1995; and (c) compel production of all documents and things contained within the government's Quality Assurance ("Q.A.") review files pertaining to the care and treatment rendered to plaintiff, Paek Morales Smith, during her pregnancy with plaintiff, Theodore Morales Smith, at Dover Air Force Base ("DAFB") in 1995.

## I. Facts and Background

Paek Morales Smith and John Smith are the parents and natural guardians of Theodore Morales Smith, who is their minor child. Paek Morales Smith and John Smith have brought this suit under the Federal Tort Claims Act ("FTCA"), Title 28, United States Code, Section 2761 et seq., on behalf of Theodore Morales Smith ("Teddy"), and in their own right.

The defendants in this matter are the United States of America ("United States" or "government"), Dr. Isagnani Chico, and National Emergency Services, Inc. ("NES").[1]

On February 7, 2000, the Honorable Roderick R. McKelvie issued an Order Rescheduling Trial Date and Referring Certain Matters to the Magistrate Judge. This matter was referred to the Magistrate Judge for the purpose of resolving several discovery disputes identified by the parties during the February 7, 2000 teleconference with Judge McKelvie.

On March 20, 2000, following a thorough review of submissions by plaintiffs and defendant, the pertinent case law and statutory authority, this court ordered the government to produce for in camera review the Quality Assurance reviews and the Administrative

Donald Evans, Evans & Bifferato, Wilmington, DE, Peter M. Villari, Paul D. Brandes, Ostroff, Villari & Kustriss, P.C., Lansdale, PA, for Paek Morales Smith, John Smith and Theodore Morales Smith.

Carl Schnee, United States Attorney, Patricia C. Hannigan, Assistant United States Attorney, Judith M. Kinney, Assistant United States Attorney, Wilmington, DE, for United States of America.

### MEMORANDUM OPINION

THYNGE, United States Magistrate Judge.

On February 22, 2000, plaintiffs moved this court to (a) compel the deposition of Captains

---

**1.** Dr. Chico was the treating physician for Paek Smith in the emergency room of the DAFB, on January 29, 1995. He treated Paek Smith pursuant to a contract between the United States and NES, with whom (NES) Dr. Chico had a separate contract.

Claim File related to plaintiffs' care at DAFB in 1995. The court subsequently set March 23, 2000 as the date for oral arguments on Plaintiffs' Motion to Compel Discovery.

On March 22, 2000, the United States filed a Motion for Reconsideration of the court's order of March 20. The government requested that oral argument on its motion be included in the agenda for March 23. Following oral argument, the court denied the government's Motion for Reconsideration, and reaffirmed its prior ruling. The government subsequently turned over the sealed Quality Assurance reviews and the Administrative Claim File to the court for review.

As noted, *supra*, the plaintiffs have moved the court to compel the discovery of materials and information solely in the possession of the United States. These materials include (1) the Q.A. review files relating to the care of Paek Smith by the Air Force in 1995; and (2) the Administrative File related to the administrative consideration of plaintiffs' medical malpractice claim which preceded this instant matter. Additionally, plaintiff's seek to depose the two JAG Corps attorneys who conducted the Air Force's investigations during the administrative consideration of this claim, Capts. Fraser and Roberts.

Plaintiffs cite several reasons why the aforementioned discovery is necessary. Specifically, the plaintiffs note: (1) the missing fetal heart monitoring strips for Paek Smith from May 15, 1995, the date Paek Smith gave birth to Teddy Smith;[2] (2) the reliance of the government's expert witnesses on a single nursing care progress note from the subject patient's visit on May 15, 1995;[3] (3) the government's refusal to hand over statements and other factual information obtained from witnesses;[4] and (4) the twice disclosed April 1995 Q.A. review regarding the medical care provided to Paek Smith.[5]

Plaintiffs seek to depose Captain Fraser and Captain Roberts because they created the Administrative Claim File, handled plaintiffs' medical records and reviewed the contents contained therein.

Plaintiffs seek to specifically depose the Captains regarding the whereabouts of fetal heart monitoring strips and how and why they were lost.[6] Plaintiffs also seek to depose Capts. Fraser and Roberts about the factual contents of the Administrative File, for the reasons cited in (3), *supra*. The plaintiffs seek to discover the contents of the Administrative Claims File for the reasons cited in (1) & (3), *supra*. Finally, the plaintiffs request an *in camera* review by the court to determine what, if any, contents of the Q.A. files are discoverable and can be revealed to the plaintiffs, in light of, *inter alia*, the reasons cited in (1) through (4), *supra*.

For its part, the United States asserts that the contents of the Q.A. files or reports are not discoverable pursuant to Title 10, United States Code, Section 1102.[7] The United

**2.** Plaintiffs submit that, upon deposition, several government witnesses admitted that Paek Smith was hooked up to a fetal heart monitor on May 15, 1995 and that a paper strip was generated. Plaintiffs' Motion to Compel Discovery at 3, *Smith v. United States*, 98–606–RRM (Feb. 22, 2000).

**3.** Plaintiffs characterize the progress note as being "sketchy." *Id*. Plaintiffs contend that this is the only piece of evidence available to document what occurred the night of May 15. The note, written by a Nurse Holman, the nurse on duty that night, is believed, by the plaintiffs, to not have been written contemporaneously with the events in question. Plaintiffs Motion to Compel Discovery at 9.

**4.** The United States contends that it possesses no such statements. Plaintiffs assert that during the deposition of Dr. Chico, he admitted that Captain

Fraser solicited a statement from him regarding this case. Plaintiffs believe this demonstrates the government's duplicity in their attempts to hide potentially inculpatory facts from the plaintiffs. Plaintiffs Motion to Compel Discovery at 4.

**5.** Plaintiffs contend that each time the April 1995 Q.A. review report was disclosed they notified the JAG Office who subsequently advised plaintiffs of the inadvertent disclosure and confidentiality of said documents. Plaintiffs were further notified that they could not use or disseminate the information contained in the Q.A., and would be subject to criminal penalties if they did so. Plaintiffs Motion to Compel Discovery at 5.

**6.** The government claims that it cannot now find the fetal heart monitoring strips.

**7.** The government contends that 10 U.S.C. § 1102 is designed to protect from disclosure the

States further asserts that the contents of the Administrative Claims File are protected from discovery under both the "work product" and "attorney-client" privileges.

Finally, the United States contends that the "attorney-client" privilege extends to protect the conversations between Capts. Fraser and Roberts, as attorneys for the Air Force, and the Air Force witnesses interviewed by them.[8] The government further contends that the reasons plaintiffs' proffered for deposing Capts. Fraser and Roberts demonstrates their actual intent—to discover the contents of privileged conversations.

## II. Jurisdiction

Pursuant to 28 U.S.C. § 636(b)(1)(A), a district court judge may designate to the magistrate judge to hear and determine any pretrial matter pending before the district court. 28 U.S.C. § 636(b)(1)(A); Fed. R.Civ.P. 72(a); D. Del. L. Ct. R. 72.1(a)(2).[9] The rules authorizing jurisdiction are the same under the Federal and Local Rules.

In *Thomas Hoar, Inc. v. Sara Lee Corp.*, the Second Circuit reemphasized the role of a magistrate judge under 28 U.S.C. § 636(b)(1)(A). The court noted that, "28 U.S.C. § 636(b)(1)(A) provides that 'a judge may designate the magistrate to hear and determine any pretrial matter pending before the court,' except for certain enumerated dispositive motions." 900 F.2d 522, 525, *cert. denied*, 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990). *See also State of New York v. United States Metals Refining Co.*, 771 F.2d 796 (3d Cir.1985) (finding that the

district court did not improperly delegate its authority by permitting the magistrate to issue an order which did not reach the merits of the lawsuit); *Lithuanian Commerce Corporation, Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205 (D.N.J.1997) (finding that magistrate judge's order concerning the admissibility of testimony not dispositive of any claim and thus permissible pursuant to the provisions of subparagraph (A) of § 636(b)(1)).

## III. Discussion

(a) **Motion to Compel Production of Government's Quality Assurance Files Pertaining to the Care and Treatment Rendered to Plaintiffs at DAFB**

■ Plaintiffs seek discovery of information contained in the Air Force's Quality Assurance files pertaining to the medical treatment received by Paek Smith in 1995 with regards to her pregnancy and the birth of Theodore Smith.

Plaintiffs concede their motion is motivated, in part, by having seen information contained in the April 1995 Q.A. report. Plaintiffs contend that their acquisition of the April 1995 Q.A. review, albeit inadvertent, constitutes a waiver of the Q.A. privilege.

Additionally, plaintiffs cite their inability to rely upon information contained in April 1995 review, to depose witnesses about the same, and the loss of Ms. Smith's fetal heart monitoring strips, *inter alia*, as adequate grounds for an *in camera* review of the Q.A. materials. As a result, they ask the court to determine whether these materials are dis-

---

very type of internal medical review that occurred in this case. United States Opposition to Plaintiffs' Motion to Compel Testimony and Production of Documents at 6, *Smith v. United States*, 98–606–RRM (Mar. 2, 2000).

8. The government specifically argued that, "[s]ince the source of this factual information is admittedly no one other than agents of the Air Force, the client, then what could have more obviously be protected by the attorney-client privilege?" United States' Opposition to Plaintiffs' Motion to Compel Discovery at 9. However, prior to oral argument on March 23, 2000, the government provided the court with a privilege log listing the documents within the Administrative File to which the sole claim of privilege was

attorney work product. Regarding the Q.A. reviews which were provided under seal, the government relied upon the privilege pursuant to 10 U.S.C. § 1102. Transcript of Oral Argument on Plaintiffs Motion to Compel Discovery at 4–20, *Smith v. United States*, 98–606–RRM (Mar. 23, 2000).

9.

RULE 72.1 **Magistrate Judge; Pretrial Orders.**
(a) **Duties in Civil Matters**
(1) **Nondispositive Motions.** Hear and determine any pretrial motion or other pretrial matter, other than those motions specified in subsection (a)(3) below, in accordance with 28 U.S.C. § 636(b)(1)(A) and Fed.R.Civ.P. 72.

coverable, to what extent, and whether the government must make the same available for discovery.

The United States notes that there have been, in fact, three Q.A. review reports generated that relate to this matter. The first two were conducted in April and June of 1995, respectively, and according to the government, the April 1995 Q.A. was inadvertently revealed to plaintiffs during the administrative consideration of the plaintiffs' claim.[10] The third Q.A. review was performed in 1997 and 1998.[11] The government further notes that none of these Q.A. reviews has been provided to the plaintiffs during this litigation.[12] United States' Opposition to Plaintiffs' Motion to Compel Discovery at 2.

The government's position is that all the Q.A. review reports are privileged under 10 U.S.C. § 1102.[13] Moreover, because the 1997 and 1998 Q.A. reports were prepared in response to a notice of claim being investigated by attorneys for the Air Force, they are further protected under the attorney "work product" and "attorney-client" privileges.[14] Id. According to the government, and contrary to plaintiffs' contention, the disclosure of the April 1995 Q.A. review does not constitute a waiver of the Q.A. privilege, and cites

Cole v. McNaughton, 742 F.Supp. 587 (W.D.Okla.1990) in support of this proposition.

### (1) Waiver

This court finds that the government is correct in its assessment of 10 U.S.C. § 1102, as precluding waiver of the Q.A. privilege. Although not explicit in its language, the intent of § 1102 is to limit the parties to whom the reviews may be provided and purposes for which the Q.A. reports may be used. The statute explicitly prevents the use or dissemination of this information by parties or for reasons not so excepted.

In pertinent part, Section 1102(e) is as follows:

**(e) Prohibition on disclosure of record or testimony.**—A person or entity having possession of or access to a record or testimony described by this section may not disclose the contents of such record or testimony in any manner or for any purpose except as provided in this section.

10 U.S.C. § 1102(e). If anything, the language of subsection (e) is not the language of waiver. By excepting the parties who may make use of this information under subsection (c),[15] and otherwise precluding use by

---

D. Del. L. Ct. R. 72.1.

10. The government notes that the first two reviews are not part of the Administrative Claim File and have not been provided to the U.S. Attorney's Office.

11. According to the government, a Q.A. review is automatic upon the administrative filing of a medical malpractice claim under the Federal Tort Claims Act. The 1997 and 1998 Q.A. reviews are part of the Air Force's administrative review of the FTCA claim. United States' Opposition to Plaintiff's Motion to Compel Discovery at 2.

12. At oral argument the government further represented that a Q.A. review does not solely occur because a notice of claim by a complainant has been filed. Such reviews are a part of and integral to the peer review process and the providing of medical/health care services to Department of Defense beneficiaries. Transcript of Oral Argument at 7. Further, an Administrative Review, which is separate and distinct from the Q.A. reviews is triggered by the filing of a notice of claim under the Federal Tort Claims Act. At that point, there is a dual process, whereby there is a legal investigation (the Administrative Re-

view) and a quality assurance investigation (the Q.A. review). Transcript of Oral Argument at 47–50.

13. § 1102. Confidentiality of medical quality assurance records: qualified immunity for participants

(a) Confidentiality of records.—Medical quality assurance records created by or for the Department of Defense as part of a medical quality assurance program are confidential and privileged. Such records may not be disclosed to any person or entity, except as provided in subsection (c).

14. The government characterized the 1997–1998 review(s) as "work product" reviews as they were done at the direction of Air Force attorneys, whereas the April and June 1995 reviews were "pure" peer reviews. United States' Opposition to Plaintiffs' Motion to Compel Discovery at 7.

15. (c) Authorized disclosure and testimony.—(1) Subject to paragraph (2), a medical quality assurance record described in subsection (a) may be disclosed, and a person referred to in subsection (b) may give testimony in connection with such a record, only as follows:

those not so excepted under threat of civil penalty (subsections (e) & (k)),[16] § 1102 essentially precludes the use of the discovery defense of "waiver" generally applicable to other privileges (i.e., attorney-client, confidentiality) under similar circumstances.

Additionally, though there is not a wealth of law on point, the case cited by the government, *Cole v. McNaughton,* 742 F.Supp. 587 (W.D.Okla.1990), fully supports the principle of "non-waiver" under the Quality Assurance privilege.

In *Cole,* a physician brought an action against the patient's attorney, the state trial judge, and the Oklahoma State Board of Osteopathic Examiners to stay a medical malpractice action, *inter alia,* until the privileged nature of the medical quality assurance records could be determined.

Cole was a doctor in the United States Army practicing at Reynolds Army Community Hospital, upon whom a medical quality assurance review had been performed regarding his performance and activities. *Cole,* 742 F.Supp. at 587–88. In preparation for the state court trial, counsel for Dr. Cole had obtained documents generated by the medi-

cal quality assurance review.[17] Dr. Cole's counsel was subsequently contacted by the Department of Justice, who informed him that pursuant to 10 U.S.C. § 1102, the "documents were confidential and could not be used for discovery purposes or at trial." [18] *Id.* Following additional precipitating events, Cole responded by filing an action to have this issue, *inter alia,* resolved by the district court.

The *Cole* court noted that "[s]ection 1102(a) clearly provides that medical quality assurance records created as part of any medical quality assurance program ... are 'confidential and privileged.' " *Cole,* at 590. The court's disposition was unmoved by the government's inadvertent disclosure and plaintiff's subsequent acquisition of the records. Concluding that such activities did not constitute a waiver of the § 1102 privilege, by noting that "[w]hile it appears that certain medical quality assurance records were placed in Dr. Cole's public-records file, the Court finds that such does not constitute a waiver of the confidential and privileged nature of these documents." *Id.*

As the *Cole* decision also suggests, the language of the statute can be understood

(A) To a Federal executive agency or private organization, if such medical quality assurance record or testimony is needed by such agency or organization to perform licensing or accreditation functions related to Department of Defense health care facilities ....

(B) To an administrative or judicial proceeding commenced by a present or former Department of Defense health care provider concerning the termination, suspension, or limitation of clinical privileges of such health care provider.

(C) To a governmental board or agency or to a professional health care society or organization, if such medical quality assurance record or testimony is needed by such board, agency... to perform licensing, credentialing, or the monitoring of professional standards....

(D) To a hospital, medical center, ... if such medical quality assurance record or testimony is needed by such institution to assess the professional qualifications of any health care provider who is or was a member or employee of the Department of Defense ....

(E) To an officer, employee, or contractor of the Department of Defense who has a need for such a record or testimony to perform official duties.

(F) To a criminal or civil **law enforcement** agency or instrumentality charged under applicable law with the protection of the public health or safety, if a qualified representative of such agency or instrumentality makes a written re-

quest that such record or testimony be provided for a purpose authorized by law.

(G) In an administrative or judicial proceeding commenced by a criminal or civil law enforcement agency or instrumentality referred to in subparagraph (F), but only with respect to the subject of such proceeding.

10 U.S.C. § 1102(c) (emphasis added).

16. **(k) Penalty.**—Any person who willfully discloses a medical quality assurance record other than as provided in this section, knowing that such record is a medical quality assurance record, shall be fined not more than $3,000 in the case of a first offense and not more than $20,000 in the case of a subsequent offense.

17. These records had, for whatever reason, been placed in Dr. Cole's public records file and thus been made publicly available.

18. The documents contained in the medical quality assurance review file included: (1) seven correspondences (letters between parties associated with the review, including Dr. Cole); (2) a report of the hearing committee dated February 15, 1983, regarding Dr. Cole's professional activities; (3) the minutes of the credentials committee; (4) a disposition form; and (5) a transcript of the medical quality assurance review hearing conducted on January 24, 1983.

*only* to preclude the possibility of a waiver.[19] Similarly, in the instant matter, the use or dissemination of Q.A. materials by those parties not so excepted, may not occur. The principle underlying the *Cole* decision clearly supports this court's finding under these similar circumstances. Therefore, this court finds the government's position regarding waiver to be correct, and as such, plaintiffs are not entitled to discover the contents of the April 1995 Q.A. review, nor that of any of the other Q.A. reviews on this ground.

### (2) *In Camera* Review

■ Additionally, plaintiffs seek an *in camera* review of the Q.A. reviews to determine whether they contain discoverable information.[20] Plaintiffs assert that there is precedent for such review, and additionally assert that there may be a "crime-fraud" exception to the government's asserted privilege.[21]

The government opposes *in camera* review of the aforementioned Q.A. materials pursuant 10 U.S.C. § 1102,[22] and reemphasized its opposition in its March 22, Motion for Reconsideration of the Court's Order, and during oral arguments on Plaintiffs' Motion to Compel Discovery, on March 23.[23]

In light of the statutory language of § 1102, *in camera* review might seem inappropriate or, at least, inconsistent with the statute's purported design. Under subsection (b)(1):

No part of any medical quality assurance record described in subsection (a) may be subject to discovery or admitted into evidence in any judicial or administrative proceeding, except as provided in subsection (c).

10 U.S.C. § 1102(b)(1).[24] However, there is a long tradition of federal courts conducting an *in camera* review of potential evidence, even in the face of a evidentiary privilege asserted by the government.

In *Kerr v. United States District Court for the Northern District of California,* the Supreme Court noted that, "in camera review of [ ] documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of irrelevance and privilege and plaintiff's asserted need for the documents is correctly struck." 426 U.S. 394, 405, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1975). The Court further stated that, "[it] has long held the view that in camera review is a highly appropriate and useful means for dealing with claims of governmental privilege." *Id.* at 405–06, 96 S.Ct. 2119. In fact, this principle has been enforced and reenforced in subsequent Supreme Court and lower court decisions. *Accord United States v. Zolin,* 491 U.S. 554, 568–69, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *United States v. Smith,* 123 F.3d 140 (3d Cir.1997); *Redland Soccer Club, Inc. v. Department of the Army of U.S.,* 55 F.3d 827 (3d Cir.1995).[25]

19. In *In re United States,* the Fifth Circuit, vacating a district court order permitting discovery of medical quality assurance records, noted that while as a general rule the failure to object to discovery requests constitutes a waiver thereof, "laches may not be used to create a greater right ... than that expressly created by Congress." 864 F.2d 1153, 1156 (5th Cir.1989). The court determined the release of the documents by the district court to be a "breach of the clear mandate of 10 U.S.C. § 1102" as it exceeded the discovery exceptions delineated in the statute. *Id.*

20. This constitutes plaintiffs' alternative argument to discover the contents of the Q.A. reviews should the court find plaintiffs' waiver argument inapplicable, as the court has done, *supra.*

21. "Plaintiffs recently completed the deposition testimony of the government's obstetrics expert, Dr. Farb. In light of his sworn testimony, plaintiffs are now compelled to further argue that the United States government may be perpetrating a fraud upon this court." Plaintiffs' Reply to United States' Opposition to Plaintiffs' Motion to Compel Discovery at 2, *Smith v. United States,* C.A. No. 98–606–RRM (March 8, 2000).

22. United States' Opposition to Plaintiffs' Motion to Compel Discovery at 8.

23. Prior to oral argument, an order issued requiring the government to produce for *in camera* review the Q.A. reviews and the Administrative File. Order, *Smith v. United States,* 98–606–RRM (Mar. 20, 2000).

24. *See also* notes 12 and 14, *supra.*

25. This principle's development preceded the holding in *Kerr* and extends into various areas of governmental privilege. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (*in camera* review of documents sought by

Therefore, in light of the governmental privilege asserted herein and commensurate with the holding in *Kerr*, this court finds it "highly appropriate and useful" to conduct an *in camera* review of the aforementioned Q.A. materials and exercises its prerogative to do so, such that the court may determine whether the Q.A. privilege is applicable and whether there are any exceptions thereto.[26]

### (A) The Quality Assurance Privilege

Upon review of submissions by counsel, pertinent case law and the statute itself, the court concludes that the Quality Assurance privilege is applicable to the quality assurance review materials at issue in this dispute.

The court does not find plaintiffs' arguments persuasive. At oral argument, plaintiffs emphasized the legislative history as protecting only the process, not the facts, by relying upon one sentence from more than a sixty page discussion. Transcript of Oral Argument at 23, 41.

However, even limiting the review to those pages of legislative history addressing confidentiality of medical quality assurance records, plaintiffs' argument would emasculate the purpose behind § 1102.

As noted therein, the overriding Congressional concern was to produce an effective mechanism allowing the military departments to monitor and ensure that quality medical care be provided to Department of Defense beneficiaries through a collegial review process operating in "an environment of confidentiality in order to elicit candid appraisals and evaluations of fellow professionals" without the fear that such records would be subject to discovery during litigation, thereby causing such beneficiaries to "receive less than the high quality of care they deserve." S.Rep. No. 331, 99th Cong.2d Sess. 245, *reprinted in* 1986 U.S.C.C.A.N. 6413, 6440. Congress specifically articulated the

discovery or use of medical quality assurance materials in limited instances. 10 U.S.C. § 1102(c).

Further, both the definition of "medical quality assurance program" and "medical quality assurance record" refute plaintiffs' argument. 10 U.S.C. § 1102(j)(1)-(2). A medical quality assurance program means,

> any activity carried out ... by or for the Department of Defense to assess the quality of medical care, including activities conducted by individuals ... or other review bodies responsible for quality assurance ... patient care assessment ... medical records ... and identification and prevention of medical ... incidents and risks.

10 U.S.C. § 1102(j)(1). A medical quality assurance record is defined as "the proceedings, records, minutes and reports that emanate from and are produced or compiled by the Department of Defense as part of a medical quality assurance program." 10 U.S.C. § 1102(j)(2).

As indicated in subsection (a) of Section 1102, regarding the confidentiality of records, "[m]edical quality assurance records created by or for the Department of Defense as part of a medical quality assurance program are confidential and privileged." 10 U.S.C. § 1102. As there is no doubt that the United States Air Force is under the auspices of the Department of Defense, and that the Q.A. materials created are part of a general Air Force medical quality assurance program, this court finds that the government privilege is generally applicable to these Q.A. review materials.

### (B) Exceptions

### (i) Waiver

For the reasons noted in III(a)(1), *supra*, the exception of waiver is inapplicable in the instant matter.

---

special prosecutor appropriate in light of claim of presidential privilege); *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (court must determine whether circumstances are appropriate for claim of privilege against revealing military secrets) (*noted in Estate of Lee B. Fisher v. Commissioner of Internal Revenue*, 905 F.2d 645, 650 (2d Cir.1990)).

**26.** However, the court exercises its prerogative to conduct *in camera* review, separate and distinct from, and in addition to, any exceptions asserted by plaintiffs. As a result of the order of March 20, 2000, and the denial of the government's motion for reconsideration in relation to *in camera* review of the Q.A. reports at oral argument, the court has reviewed those records, as well as, the Administrative File.

### (ii) The Crime–Fraud Exception

Plaintiffs assert that by concealing the contents of the Q.A. reviews through means of the Q.A. privilege, the United States may be attempting to perpetrate a fraud upon the court. Plaintiffs believe their assertion is supported by the deposition testimony of Dr. Farb, the government's obstetrics expert and the contents of the April 1995 Q.A. review. Because plaintiffs are not able to reveal the pertinent information contained in the April 1995 Q.A. without criminal penalty, they contend that only an *in camera* review of the applicable materials can determine whether a fraud is actually being perpetrated.

#### (a) Propriety

At first impression, the crime-fraud exception might not seem applicable to the instant matter.[27] In *United States v. Zolin*, the crime-fraud exception was applied to challenge the attorney-client privilege. 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The *Zolin* Court held that "in camera review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception." *Zolin*, 491 U.S. at 574, 109 S.Ct. 2619 (emphasis added).[28]

However, the preceding does not rule out the application of the crime-fraud exception in other contexts. In fact, the crime-fraud exception has been interpreted by other courts to apply to other privileges, and as such, may provide a foundation for applying the exception in the instant matter.

For example, in *In re Grand Jury Proceedings (Gregory P. Violette)*, the First Circuit found that "the crime-fraud exception applies to the psychotherapist-patient privilege." 183 F.3d 71, 73 (1st Cir.1999).[29] The First Circuit found the crime-fraud exception applicable because as it noted, "[t]he *Jaffee* Court did not envision the psychotherapist patient privilege as absolute or immutable. Rather, the Court suggested the possibility of exceptions to the operation of the privilege and prophesied that the details would emerge on a case-by case basis." *Violette*, at 74 (paraphrasing the Supreme Court opinion in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996)).[30]

The guiding principle of the *Violette* court in considering the application of the crime-fraud exception to the psychotherapist-patient privilege was "whether protecting a particular class of confidential communications 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *Violette*, at 74. The court further noted that, "the rationale for the exception must be that the systematic benefits of protecting this category of communications are outweighed by the costs of foregoing probative evidence of criminal activity." *Id.* at 75–76.

However, the *Violette* court also determined that integral to this evaluative process was a need for the court to "first decide whether a potentially relevant exception exists. If not, the court's inquiry **ends**. If, however, the exception exists, the court then must define its parameters sufficiently to ascertain whether the specific facts of the

---

27. In particular, because the crime-fraud exception to the attorney-client privilege is a testimonial privilege and as such deals primarily with verbal communications, whereas the 1997–1998 Q.A. review reports and the Administrative File are included in the "work product" of the Air Force attorneys. The Q.A. reports of 1995 were a peer review process initiated in the absence of an legal proceeding.

28. Notably, in a civil context, attorney work product is discoverable upon a substantial showing of necessity or justification. Fed.R.Civ.P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (paraphrased).

29. *See also United States v. Rakes*, 136 F.3d 1 (1st Cir.1998) (assuming without finding that marital communication privilege would be lost to defen-

dant husband had he made communications to his wife for the purpose of carrying out a crime, where court acknowledged that both the attorney client privilege and the marital communication privilege are subject to a similar but not identical incarnations of the crime-fraud exception); *Ellis v. United States*, 922 F.Supp. 539 (D.Utah 1996) (applying Utah law on clergy privilege and the *Zolin* analysis in a FTCA case, a magistrate judge found, during *in camera* review, communications to cleric(s) unprotected by privilege).

30. In *Jaffee*, the Supreme Court formally recognized the psychotherapist-patient privilege as a matter of federal common law.

case fit within its confines." *Id.* at 75 (emphasis added).

Therefore, this court's inquiry should be guided, initially, by whether an applicable exception applies. Based upon the guidance of *Violette,* and the analysis in (ii)(c) *infra,* this court will assume, without finding, that a "potentially relevant exception exists" in the crime-fraud exception.[31]

■ As noted, the seminal case of *United States v. Zolin* provides the foundation for the application of the crime-fraud exception to the attorney-client and similar privileges. 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469. Therein, the Supreme Court noted that,

[b]efore engaging in in camera review to determine the applicability of the crime fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that in camera review of the material may reveal evidence to establish the claim that the crime-fraud exception exists.

*Zolin,* 491 U.S. at 572, 109 S.Ct. 2619 (citation omitted). The court then further held that, "once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Id.* Therefore, two separate issues must be evaluated to determine whether *in camera* review on the basis of the crime fraud exception is appropriate: (1) adequate factual basis; and (2) appropriateness based upon the discretion of the court. Each issue will be examined in turn.

### (b) Adequate Factual Basis

Plaintiffs submit that "a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials will reveal evidence to establish that the crime-fraud exception applies" is demonstrated by: (1) the loss of the fetal heart monitoring strips of Paek Smith from May 15, 1995; (2) the government's refusal to provide plaintiffs statements and other factual information obtained from witnesses;[32] (3) the contents of the April 1995 Quality Assurance review report; and (4) the testimony of Dr. Farb.[33] Ultimately, each reason cited by plaintiffs is important in determining whether an "adequate factual basis" exists, as each goes to the "standard of care" provided during the event in question, and whether the government is attempting to conceal any mistakes made.

First, plaintiffs note the loss of the missing fetal heart monitoring strips. Plaintiffs' inference is that the loss of those strips is an intentional act by the government, rather than something more mundane as the failure to exercise proper care with medical records. The court is not prepared, based upon plaintiffs inference and the nature of the circumstances, to find that the government intentionally lost the aforementioned strips, but does, however, acknowledge that the monitoring strips may be critical evidence in determining whether there is a basis for alleging a deviation from the standard of care, and notes that the loss of that singular piece of evidence is unusual.

Second, plaintiffs contend that the government is refusing to provide statements from their witnesses in an attempt to conceal pertinent and potentially inculpatory facts from the plaintiffs. The government contends that is has no such statements. The court recognizes that at times in litigation, although hopefully not to often, discoverable, but damaging information may be withheld

---

**31.** This court further assumes, without finding, that the systematic benefits of protecting this category of communications **are** outweighed by the costs of forgoing probative evidence of criminal activity, and thus, this class of confidential communications **may not** promote sufficiently important interests to outweigh the need for such probative evidence.

**32.** Plaintiffs' suggest that during the deposition of Dr. Chico, the doctor admitted to providing statements to the government at its request. Plaintiffs note that the government has denies possessing any statements from witnesses, and

suggests that this demonstrates the government's efforts to "hide pertinent and potentially inculpatory *facts* from the plaintiffs." Plaintiffs' Motion to Compel Discovery at 4 (emphasis in original).

**33.** The substance of plaintiffs claim is that the Q.A. reviews will reveal "substantive deviations from the standards of care relating to Paek Smith's pregnancy with her son," and that Dr. Farb's inconsistent testimony is designed to conceal that deviation. Plaintiffs' Reply to the United States' Opposition at 2–3.

by a party. The court does not believe, at present, that the government is concealing pertinent information, but since it cannot represent what is or is not contained in the Q.A. reviews, the court is disinclined to dismiss plaintiffs contention out of hand.

Third, plaintiffs cite, albeit indirectly, their knowledge of the contents of the April 1995 Q.A. review inadvertently disclosed to them and suggest that its' contents demonstrate why a fraud is being perpetrated upon the court. The court, for reasons discussed *infra*, is unwilling to contemplate whether the contents of that review may be considered in evaluating adequate factual basis.

Finally, plaintiffs note that the testimony of Dr. Farb also demonstrates that a fraud is being perpetrated upon the court, presumably when compared against the contents of the April 1995 Q.A. review. In and of itself, the testimony likely gives the plaintiffs pause because it suggests that there was no deviation from the standard of care provided to plaintiffs. The court does not know what conclusions should be drawn from the balance of the doctor's testimony. However, in light of plaintiffs' burden, the court is provisionally willing to accept plaintiff's assertion.

Therefore, the court will also assume, without finding, that an "adequate factual basis" has been established. Based solely on the preceding, the court is certainly not inclined to find that an actual fraud is taking or has taken place. But, such a finding is not required at this juncture.[34] Simply put, all that is needed is "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials **may reveal** evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572, 109 S.Ct. 2619 (emphasis added).

Although, what has been presented, herein, may "strain the credibility" of what constitutes a "good faith basis by a reasonable person," for the purposes of this phase of the analysis, plaintiffs are given the benefit of the doubt.

**(c) Discretion of the Court**

Next, the court must evaluate whether it is appropriate to exercise its' discretion to apply the crime-fraud analysis in light of the facts and circumstances surrounding this matter.

In *Zolin*, the Supreme Court recommended that such a determination to exercise discretion be made in light of,

> the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469.

First, the court finds that, although not insubstantial, the Q.A. materials are sufficiently manageable to allow for *in camera* review.

Second, the court finds that the contents of the Q.A. review materials are pertinent to an ultimate issue in this case, that is, whether the care provided Paek Smith at DAFB deviated from the applicable standard of care required.

Third, it is recommended for the court to find based on the evidence produced *in camera*, when coupled with that evidence already available, that the crime-fraud exception does apply notwithstanding the asserted privilege. However, it is at this point where the analysis comes to a halt.

██ The first problem presented is provided by the *Zolin* holding itself. Therein, the Supreme Court delineated what evidence a court may consider in exercising its discretion to undertake an *in camera* review based upon the crime-fraud exception. In pertinent part, the Court found that, "materials that have been determined to be privileged may not be considered in making the preliminary determination of the existence of a privilege," and as this court understands it,

---

**34.** As the Supreme Court noted in *Zolin*, "the threshold test we set, need not be a stringent

one." *Zolin*, at 572, 109 S.Ct. 2619.

whether an exception thereto is applicable. *Zolin,* at 573, 109 S.Ct. 2619.

Plaintiffs are requesting the court to consider the privileged Q.A. materials in making this determination. Commensurate with *Zolin,* this is something the court will not do.

Thus, the court is left to consider only the allegations made by plaintiffs in (ii)(b) *supra,* coupled with the evidence already available.

█ After having considered all of the pertinent evidence, this court finds that there is insufficient evidence to allow it to "undertake an in camera review of [the] . . . privileged communication[s] at the behest of the [plaintiffs]," [35] and therefore will not exercise its discretion to review the privilege in light of the crime-fraud exception as proffered by the plaintiffs.

### (iii) *Dayton Newspapers* Exception

█ Finally, the court finds that there is precedent for the discovery of some, albeit limited, information contained in quality assurance reviews or generated from a medical quality assurance program.

In *Dayton Newspapers, Inc. v. Dept. of the Air Force,* a district court found that under the Freedom of Information Act ("FOIA"), a newspaper could obtain contents of a medical quality assurance program or review provided that the information predated the program or review and was independent therefrom.[36] 35 F.Supp.2d 1033 (S.D.Ohio 1998).

The newspaper corporation in *Dayton Newspapers* sought a release of information from military databases containing information on medical malpractice cases. The Air Force contended that the entire contents of the database were protected from FOIA under 10 U.S.C. § 1102, but the court found to the contrary.

The court held that the "records were protected only to the extent that they stem from an *activity designed to assess* the quali-

ty of medical care and were *not created or maintained* outside the medical quality assurance program." *Dayton Newspapers,* at 1036 (emphasis added). The court further stated that, "for example, a patient's medical records are not immune from disclosure on the sole grounds that the information therein was presented during meetings of a committee designed as part of a medical quality assurance program." *Id. Accord EEOC v. Med–National, Inc.,* 186 F.R.D. 609, 616–17 (D.Hawai'i 1999).

Similarly, this court finds that factual information contained in the Q.A. reviews (i.e., medical records) are not "immune from disclosure," if that information predated the Q.A. review and was not created solely for purposes of that review. The singular example of this type of information, presently known, is the fetal heart monitoring strips.

The fetal heart monitoring strips both preexisted the June 1995 Q.A. review, as a form of a "medical record," and also were not created for the purpose of performing a Q.A. review. The facts contained in the fetal heart monitoring strips, that is, fetal heart rate and quality and frequency of contractions, would be discoverable notwithstanding its incorporation into a Q.A. review. If the information contained on the monitoring strips were available from another source, or if the monitoring strips themselves were available, the court would not be finding as it does today. It is the nature of these particular circumstances (i.e., loss of the monitoring strips by the government), that causes this determination.

However, the court, in exercising its prerogative to conduct an *in camera* review to determine whether the Q.A. privilege and this exception applies, has determined that none of the Q.A. materials contain any additional information about the contents of the fetal heart monitoring strips for Paek Smith from May 15, 1999, beyond that obtained

---

**35.** *Zolin,* at 573, 109 S.Ct. 2619.

**36.** The *Dayton* court drew their conclusion from the language of subsection (h) of the statute which states,

Nothing in this section shall be construed as limiting access to the information in a record created and maintained outside a medical

quality assurance program, including a patient's medical records, on the grounds that the information was presented during meetings of a review body that are part of a medical quality assurance program.
10 U.S.C. § 1102(h).

through the records already provided. Therefore, no contents of the Q.A. reviews are discoverable to the plaintiffs under this exception.

### (b) Motion to Compel Production of the Administrative Claims File

The plaintiffs seek to discover the contents of the Administrative Claims File as it relates to the administrative consideration of plaintiffs' medical malpractice claim. They assert a need to discover the contents of this file on much the same basis they seek to discover information contained in the Q.A. reviews. Plaintiffs, again, specifically note the absence of the fetal heart monitoring strips and assert their belief that the government is trying to hide pertinent facts and information from them. Plaintiffs' Motion to Compel Discovery at 4.

Plaintiffs additionally claim that the contents of the administrative file are discoverable, and are not protected by either the "attorney-client" or "work product privileges," because at the time the information was being gathered and the file was created, Capts. Fraser and Roberts were operating as "claims adjusters," rather than as lawyers "in anticipation of litigation." Plaintiffs' Motion to Compel Discovery at 8.

In response, the government asserts that: (1) the filing of a Federal Tort Claims Act administrative claim is an adversarial action from the very beginning; (2) the responsibilities of the licensed attorney who is the claims officer (Capt.Fraser) are "quintessentially" those of an attorney[37]; and (3) the attorney-client privilege protects the communications between the Air Force attorney and the witnesses he interviews.[38] United States Re-

sponse to Plaintiffs' Motion to Compel Discovery at 8–9.

At this juncture, rather than delving into the volumes of history regarding the "attorney-client" and "work product" privileges, and upon having conducted an in camera review of the administrative file and considering the arguments of counsel and additional pertinent evidence, the court finds the vast majority of the contents of the administrative file to be protected under the work product privilege.[39]

Because of the court's understanding of what "triggers" an administrative claims process, as well as all of the activities associated therewith[40] in creating the administrative claims file, Capts. Fraser and Roberts, as well as other counsel, were acting as attorneys for the Air Force in "anticipation of litigation."

Pursuant to Title 28, United States Code, Section 2671, et seq., the first stage in the filing in of a FTCA claim is an administrative consideration process by the pertinent federal agency, wherein it has the authority to consider and, if possible, settle said claim. In pertinent part, Title 28, United States Code, Section 2672 reads:

> The head of each Federal Agency or his designee, in accordance with regulations prescribed by the Attorney General, may consider, ascertain, adjust, determine, compromise, and settle any claim for money damages against the United States for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment . . . .

---

**37.** And, the government contends, in the process of performing his role as an attorney, Capt. Fraser's recordings of his " 'mental impressions, conclusions, opinions or legal theories' " become "work product," the very thing that Rule 26(b)(3) protects from disclosure.

**38.** At oral argument, the government made the comparison of the Air Force attorney acting in the capacity of in-house counsel of a corporation responding to a notice of a potential lawsuit.

**39.** Despite its previous arguments, the government's privilege log asserted only the work prod-

uct privilege. That privilege, which applies to counsel, rather than the client, protects memoranda, recorded mental impressions, synopses of witnesses' statements, draft documents and the like prepared by an attorney "with an eye toward litigation," unless substantial good cause can be shown for its production. *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136 (D.Del.1977).

**40.** Which includes the creation of Q.A. reviews for the purposes of considering the malpractice claim itself.

28 U.S.C. § 2672. While this process is "figuratively" a "claims process," it is more "literally" the foundation of the defense of said claim, should the administrative process not result in some manner or form of settlement.[41] As such, plaintiffs' reliance on the holding in *Mission National Ins. Co. v. Lilly,* 112 F.R.D. 160 (D.Minn.1986) is misplaced.

Plaintiffs have, however, demonstrated "substantial need" to obtain information not otherwise protected by the aforementioned privileges. With regards to the reasons specifically enumerated by plaintiffs for discovering the contents of the Administrative Claims File, the court, upon review, has found no discoverable information contained within the file regarding the fetal heart monitoring strips.

Additionally, the court has found no discoverable information which it perceives the government to have intentionally hidden from plaintiffs; that is, all information to which the government has asserted a privilege was reasonably considered by the government and is privileged.

▆▆ However, this having been said, some limited portions of the Administrative File are discoverable. They include the following:

1. Before Tab A, File 1. 12/27/97 one page memorandum. This is primarily a transmittal letter which does not contain mental impressions of counsel.

2. Tab L, File 3. The letters of November 24, 1997, October 30, 1997, June 19, 1997, and April 4, 1997 between counsel. These are transmittal letters to which no work product privilege would attach.

3. Tab L, File 3. 4 letters dated April 4, 1997 to various medical care providers of plaintiffs. These letters are requests for medical records and are therefore not protected under attorney work product.

4. Tab L, File 3. 4 Letters of Capt. Fraser dated 3/28/97 to health care providers involving plaintiffs care. The at-

torney work product goes to protecting mental impressions and opinion of counsel, which if disclosed, may be waived by counsel. None of these letters fall within the work product privilege.

**(c) Motion to Depose Capts. Fraser and Roberts of the JAG Corps**

▆▆ Finally, plaintiffs seek to depose Capts. Fraser and Roberts to, as they put it, "understand what factual information they obtained from [the] witnesses regarding the night in question." Plaintiffs' Motion to Compel Discovery at 10.

Plaintiffs' assert that this information is critical because it goes directly to the issue of whether the Air Force doctors and nurses failed to timely diagnose and treat pre-term labor and potential later choiroamnionitis infection. *Id.* at 9. Plaintiffs again note the absence of the fetal heart monitoring strips, and limited recollections of the doctors and nurses for the night of May 15, 1995, as the grounds for such discovery.

In response, the government refers to subsection (b)(2) which states,

**(b) Prohibition on disclosure and testimony.**

(2) A person who reviews or creates medical quality assurance records for the Department of Defense or who participates in any proceeding that reviews or creates such records may not be permitted or required to testify in any judicial or administrative proceeding with respect to such records or with respect to any finding, recommendation, evaluation, opinion or action taken by such person or body in connection with such records except as provided in this section.

10 U.S.C. § 1102(b)(2). The government asserts that none of the statutory exceptions (under subsection (c)) apply, and as such the plaintiffs are precluded from deposing Capts. Fraser and Roberts. The government further asserts that the "attorney-client" privilege protects communications "between the

---

**41.** The 1997 and 1998 Q.A. reviews are, and in this case, were created during this process, but as noted in III(a) *supra,* they are generally protected under 10 U.S.C. § 1102 with very limited exception.

Air Force attorney and the Air Force witnesses interviewed by him." United States Response to Plaintiffs' Motion to Compel Discovery at 9.

In response, plaintiffs argue that, although disfavored, neither the law of the Third Circuit nor the Federal Rules of Civil Procedure preclude opposing counsel from being deposed.

Plaintiffs contend that the proper inquiry upon determining whether to allow a party to depose opposing counsel is whether "(1) no other means exist to obtain the information; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Evans v. Atwood,* 1999 WL 1032811, at *2 (D.D.C. Sept.29, 1999) (*quoting Shelton v. American Motors Corporation,* 805 F.2d 1323, 1327 (8th Cir.1986)). *Accord Curiale v. Tiber Holding Corporation,* 1997 WL 786446, at *1 (E.D.Pa. Dec.2, 1997); *Advanced Power Systems, Inc. v. Hi–Tech Systems, Inc.,* 1993 WL 30067 (E.D.Pa. Feb.4, 1993).

As acknowledged in III(b) *supra,* plaintiffs have demonstrated a "substantial need" to discover information pertinent to their case. However, expansive discovery into facts obtained or the processes for obtaining said facts included in the Q.A. review or the Administrative File would effect an "end run" around the protections already provided this information through the attorney-client, work product, or government privileges.

Therefore, plaintiffs' deposition of Capts. Fraser and Roberts would have to be particularly narrowly tailored to answer specific questions. Only questions regarding the whereabouts of the fetal heart monitoring strips, the handling of that medical record, and the factual information contained thereon, if such knowledge is possessed by the captains, could be discoverable at deposition.

As noted, the *Shelton* test provides the framework for such discovery. First, the monitoring strips are clearly "crucial to the preparation" of this case.[42] Plaintiffs have specifically noted that the information contained on the monitoring strips goes directly to whether the standard of care received by Paek Smith was inadequate. Plaintiffs, as previously discussed, have limited, at best, access to pertinent, factual, medical information in this regard.

Second, there are "no other means" by which plaintiffs can "obtain the information." [43] Unless and until the monitoring strips reappear or are found, they have no way of knowing what information was contained on them.

Third, the "information sought is [clearly] relevant," for the reasons expressed, *infra.*[44] However, the critical question is whether this information is "nonprivileged." The answer to this question is not simply relevant for determining whether Capts. Fraser and Roberts can be deposed, but it is also the crux of this whole discovery dispute. In order to resolve this question, it is necessary to partially reexamine the discussion in III(a) *supra.*

The government notes in its brief, "it is not just the Q.A. results that Congress sought to protect, but the entire process, as the following portion of legislative history reflects:

> Central to these quality assurance activities is the peer review process. This is the process by which the performance of individual physicians ... [are] reviewed by their peers. To be effective, this type of collegial review process must operate in an environment of confidentiality in order to elicit candid appraisals and evaluation of fellow physicians.

S. Rep. 331, 99th Cong.2d Sess. 245–246 (1986) *reprinted in* 1986 U.S.C.C.A.N. 6413, 6440. (emphasis added)." [45] United States Response to Plaintiffs' Motion to Compel Discovery at 7.

In light of the legislative history, it strains credibility to suggest that the "environment

---

42. *Shelton* test prong (3).

43. *Shelton* test prong (1).

44. *Shelton* test prong (2).

45. The government argues that both the " 'pure' Q.A. reviews of 1995 and the 'work product' reviews of 1997 and 1998" are fully protected under this interpretation of the legislative history. United States Opposition to Plaintiffs' Motion to Compel Discovery at 7.

of confidentiality" under which "candid appraisals and evaluation[s]" are obtained would be negatively impacted by simply eliciting from Capts. Fraser and Roberts the factual information contained on the missing fetal heart monitoring strips to the extent of their recollection.[46] As previously emphasized, to the extent that, during deposition, plaintiffs would stray "far afield" of this specific line of questioning, the government would have adequate justification to assert the quality assurance and/or work product privileges.

However, as has been noted, the court's review of the Q.A. reports and Administrative File has revealed no substantive factual information or references to the fetal heart monitoring strips beyond what has already been produced in the medical records. Further, the in camera records reviewed do not indicate that either attorney ever possessed or had access to the strips during their investigations. Since Capts. Fraser and Roberts possess no substantive factual knowledge of the fetal heart monitoring strips, the court finds that plaintiffs will not be able to elicit any valuable factual information regarding the monitoring strips from them, and thus, their depositions will not be permitted.

## IV. Conclusion

In conclusion, as a result of the analysis expressed herein, the documents that are discoverable are those delineated on page 30 of this opinion. Further, plaintiffs motion to depose Capts. Fraser and Roberts is DENIED.

An order consistent with this opinion shall follow.

46. As well as, information regarding the whereabouts and the handling of the same.