SENTELLE, Circuit Judge,
concurring.
As noted in the opinion of the court, I write separately to express my differing basis for affirming the District Court on the common law privilege issue. I would hold that reporters refusing to testify before grand juries as to their “confidential sources” enjoy no common law privilege beyond the protection against harassing grand juries conducting groundless investigations that is available to all other citizens. While I understand, and do not actually disagree with, the conclusion of my colleagues that any such privilege enjoyed by the reporters has been overcome by the showing of the United States, and that we therefore need not determine whether such privilege exists, I find this ordering of issues a bit disturbing. To me, the question of the existence of such privilege vel non is logically anterior to the quantum of proof necessary to overcome it. *26 While I understand Judge Henderson’s theory that she cannot support a privilege afforded by the common law which would not be overcome by the quantum of proof offered by the government, I think it more logical to not reach the quantum question in the absence of a determination as to the existence of the privilege than to proceed the other way around.[1] That said, I fully join the conclusion that we should affirm the District Court’s decision to hold the appellants in contempt, unswayed by their claim of protection of common law privilege. I write separately only to explain my reasons for rejecting the theory that such a privilege is known to the common law.
I base my rejection of the common law privilege theory on foundations of precedent, policy, and separation of powers. As to precedent, I find Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), to be as dispositive of the question of common law privilege as it is of a First Amendment privilege. While Branzburg generally is cited for its constitutional implications, the Branzburg Court repeatedly discussed the privilege question in common law terms as well as constitutional. Indeed, the majority opinion by Justice White includes the phrase “common law” no fewer than eight times. More significant than the fact that the Court frequently spoke of the common law is what the Court had to say about it: “at common law, courts consistently refuse to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury.” Id. at 685, 92 S.Ct. 2646 (collecting cases).
At page 688, 92 S.Ct. 2646, the Court continued, “although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that ‘the public ... has a right to every man’s evidence,’ except for those persons protected by a constitutional, common law, or statutory privilege ... is particularly applicable to grand jury proceedings.” (emphasis added) (citations omitted). Significantly, the Court made this statement in the course of holding the journalists litigating before it unprotected by privilege against contempt citations. Granted, the Court expressly held that it was not about to create a new “constitutional” privilege. But in the same paragraph with that rejection it expressly discusses the possible protection of common law and in the end reaches a result that leaves the reporters unprotected. I think it therefore indisputable that the High Court rejected a common law privilege in the same breath as its rejection of such a privilege based on the First Amendment. Especially is this so when we consider that it makes little sense to assume that the Court first reached out to take a constitutional question it would not have needed to answer had there been such a common law privilege, and then proceeded to answer that question in such a fashion as to reach a result upholding contempt citations and reversing vacation of such citations.[2]
*27 Because the Supreme Court rejected the common law privilege, I think it would be at least presumptuous if not overreaching for us to now adopt the privilege. As the opinion of the court notes, “the Supreme Court has told us:
If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the court of appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”
Maj. Op. at 972 (quoting Rodriguez de Quijas v. Shearson/American Express, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).
The Supreme Court has rejected a common law privilege for reporters subpoenaed to give evidence to grand juries. In my view that rejection stands unless and until the Supreme Court itself overrules that part of Branzburg. Although the appellants argue that other changes in the law since Branzburg should lead to an opposite result, I think that argument should appropriately be made to the Supreme Court, not the lower courts.[3]
Even if appellants are correct that we would have the power to adopt such a privilege in the face of the Branzburg precedent, I nonetheless would not accept that invitation. Appellants’ argument for our authority to adopt the new privilege begins with the Federal Rules of Evidence. Rule 501, enacted by Congress in the Federal Rules of Evidence in 1975, three years after Branzburg, rejected an enumeration of specific federal privileges and provided that privileges in federal criminal cases “shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.” Although the rules became effective after Branzburg, Rule 501 does not effect any change in the authority of federal courts to adopt evidentiary privileges. Before the enactment of the Federal Rules of Evidence, the authority of the federal courts to adopt common law privileges was governed by case law. The relevant case law provided for precisely the same authority as Congress enacted in the rules. Indeed, the language of the rule is drawn directly from case law governing at the time of Branzburg. The Supreme Court expressly held in Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934), that
the rules governing the competence of witnesses in criminal trials in the federal .courts are not necessarily restricted to those local rules enforced at the time of the admission into the union of the particular state where the trial takes place, but are governed by common law principles as interpreted and applied by the federal courts in the light of reason and experience.
291 U.S. 7, 12, 54 S.Ct. 279, 78 L.Ed. 617 (1934) (citing Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933)) (emphasis added). Given the venerable origins of the language used in Rule 501, it cannot be said that the courts have more ■ power to adopt privileges today than at the time of Branzburg. The power is precisely the same. Thus, the enactment of Rule 501 cannot by itself work any change in the law which should empower us to depart from the Supreme Court’s clear precedent in Branzburg.
Appellants persist, however, that the state of the common law has changed sufficiently to warrant a new approach. By appellants’ count, at the time of the Branzburg decision, only seventeen states had *28 enacted what appellants refer to as “shield laws” to protect journalists from forced disclosure of confidential sources or news-gathering materials, while today, thirty-one states (plus the District of Columbia) have such statutes.[4] Nonetheless, I think it remains the prerogative of the Supreme Court rather than inferior federal tribunals to determine whether these changes are sufficient to warrant an overruling of the Court’s rejection of such a common law privilege in Branzburg.
Furthermore, even if we are authorized to make that decision, reasons of policy and separation of powers counsel against our exercising that authority. While I concede that the adoption of the “shield” by legislation rather than judicial fiat does not prevent the change being considered by the courts in assessing the common law, I find the adoption of the privilege by the legislatures of the states instructive as to how the federal government should proceed, if at all, to adopt the privilege. The statutes differ greatly as to the scope of the privilege, and as to the identity of persons entitled to the protection of the privilege. We have alluded in the majority opinion to the differing decisions of courts as to civil, criminal, and grand jury proceedings. There is also a more fundamental policy question involved in the crafting of such a privilege.
The Supreme Court itself in Branzburg noted the difficult and vexing nature of this question, observing that applying such privilege would make it
necessary to define those categories of newsmen who qualify for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods.
408 U.S. at 704, 92 S.Ct. 2646. The Supreme Court went on to observe that “freedom of the press is a ‘fundamental personal right ... not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets .... The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.’ ” Id. (quoting Lovell v. Griffin, 303 U.S. 444, 450, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938)). Are we then to create a privilege that protects only those reporters employed by Time Magazine, the New York Times, and other media giants, or do we extend that protection as well to the owner of a desktop printer producing a weekly newsletter to inform his neighbors, lodge brothers, co-religionists, or co-conspirators? Perhaps more to the point today, does the privilege also protect the proprietor of a web log: the stereotypical “blogger” sitting in his pajamas at his personal computer posting on the World Wide Web his best product to inform whoever happens to browse his way? If not, why not? How could one draw a distinction consistent with the court’s vision of a broadly granted personal right? If so, then would it not be possible for a government official wishing to engage in the sort of unlawful leaking under investigation in the present controversy to call a trusted friend or a political ally, advise him to set up a web *29 log (which I understand takes about three minutes) and then leak to him under a promise of confidentiality the information which the law forbids the official to disclose?
The state legislatures have dealt with this vexing question of entitlement to the privilege in a variety of ways. Some are quite restrictive. Alabama limits its protection to “person[s] engaged in, connected with, or employed on any newspaper, radio broadcasting station or television station, while engaged in a newsgathering capacity.” Ala. Code § 12-21-142. Alaska’s statutes protect only the “reporter,” a category limited to “person[s] regularly engaged in the business of collecting or writing news for publication or presentation to the public, through a news organization.” Alaska Stat. § 09.25.300. The statutory privilege in Arizona protects “a person engaged in newspaper, radio, television or reportorial work, or connected with or employed by a newspaper or radio or television station .... ” Ariz. Rev. Stat. § 12-2237. Arkansas’s legislature has declared the privilege applicable to “any editor, reporter, or other writer for any newspaper, periodical, or radio station, or publisher of any newspaper or periodical, or manager or owner of any radio station ....” Ark. Code Ann. § 16-85-510. Delaware is perhaps the most specific, protecting a “reporter,” which
means any journalist, scholar, educator, polemicist, or other individual who either: (a) At the time he or she obtained the information that is sought was earning his or her principal livelihood by, or in each of the preceding 3 weeks or 4 of the preceding 8 weeks had spent at least 20 hours engaged in the practice of, obtaining or preparing information for dissemination with the aid of facilities for the mass reproduction of words, sounds, or images in a form available to the general public; or (b) Obtained the information that is sought while serving in the capacity of an agent, assistant, employee, or supervisor of an individual who qualifies as a reporter under sub-paragraph a.
Del. Code Ann. tit. 10 § 4320. Presumably, states such as these would provide the privilege only to the “established” press.
Others are quite inclusive. The Nebraska legislature, for example, has declared:
(1) That the policy of the State of Nebraska is to insure the free flow of news and other information to the public, and that those who gather, write, or edit information for the public or disseminate information to the public may perform these vital functions only in a free and unfettered atmosphere; (2) That such persons shall not be inhibited, directly or indirectly, by governmental restraint or sanction imposed by governmental process, but rather that they shall be encouraged to gather, write, edit, or disseminate news or other information vigorously so that the public may be fully informed.
Neb. Rev. Stat. § 20-144. To that end, it protects any “medium of communication” which term “shall include, but not be limited to, any newspaper, magazine, other periodical, book, pamphlet, news service, wire service, news or feature syndicate, broadcast station or network, or cable television system.” Id. at § 20-145(2) (emphasis added).
In defining the persons protected by that privilege, Nebraska tells us that “Person shall mean any individual, partnership, limited liability company, corporation, association, or other legal entity existing under or authorized by the law of the United States, any state or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any foreign country.” Id. at 20-145(7). Presumably, then, Nebraska, perhaps more in keeping with the spirit of the recent revo *30 lutionaries who gave us the First Amendment, protects the pamphleteer at the rented printer, and the blogger at the PC, as well as the giant corporation with its New York publishing house.
The variety of legislative choices among the states only serves to heighten the concern expressed by the majority in Branzburg. See 408 U.S. at 704, 92 S.Ct. 2646. This concern is reinforced by examination of the Jaffee decision, upon which appellants rely. In Jaffee, the Supreme Court extended a federal privilege “to confidential communications made to licensed social workers in the course of psychotherapy.” 518 U.S. at 15, 116 S.Ct. 1923. There is little definitional problem with the application of this privilege. The court need only ask: Does this “social worker” have a license? If the answer is “yes,” then the privilege applies; if it’s “no,” the privilege does not. If the courts extend the privilege only to a defined group of reporters, are we in danger of creating a “licensed” or “established” press? If we do so, have we run afoul of the breadth of the freedom of the press, that “fundamental personal right” for which the 'Court in Branzburg expressed its concern? 408 U.S. at 704, 92 S.Ct. 2646. Conversely, if we extend that privilege to the easily created blog, or the ill-defined pamphleteer, have we defeated legitimate investigative ends of grand juries in eases like the leak of intelligence involved in the present investigation?
Nor does the identity of the protected persons constitute the only difficult policy decision. Branzburg enumerates several concerns. For example, does “the public interest in possible future news about crime from undisclosed, unverified sources ... take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future”? Id. at 695, 92 S.Ct. 2646. Do “agreements to conceal information relevant to the commission of crime avail little to recommend them from the standpoint of public policy”? Id. at 696, 92 S.Ct. 2646. What are we to do with the historic common law recognition of “a duty to raise the ‘hue and cry’ and report felonies to the authorities”? Id. (see also authorities collected in id. at 696 n. 34, 92 S.Ct. 2646). Should we be creating immunity from prosecution for “misprision” of a felony-that is, the concealment of a felony? Id. at 696, 92 S.Ct. 2646.
Should the privilege be absolute or limited? If limited, how limited? Without attempting to catalog, I note that the state statutes provide a variety of answers to that policy question. Therefore, if such a decision requires the resolution of so many difficult policy questions, many of them beyond the normal compass of a single case or controversy such as those with which the courts regularly deal, doesn’t that decision smack of legislation more than adjudication? Here, I think the experience ■ of the states is most instructive. The creation of a reporter’s privilege, if it is to be done at all, looks more like a legislative than an adjudicative decision. I suggest that the media as a whole, or at least those elements of the media concerned about this privilege, would better address those concerns to the Article I legislative branch for presentment to the Article II executive than to the Article III courts.
For all the reasons set forth above, I would hold that there is no common law privilege protecting reporters or any other news media personnel, no matter how defined, from the reach of grand jury subpoenas on claim of confidentiality.

. See Opinion of Judge Tatel at pp. 988-91.

. By way of comparison, under the constitutional avoidance doctrine, the-Supreme Court counsels courts "to adopt constructions of statutes to ‘avoid decision of constitutional questions,' not to deliberately create constitutional questions.” See, e.g., McConnell v. Federal Election Commission, 540 U.S. 93, 180, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); United States v. 37 Photographs, 402 U.S. 363, 373, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), United States ex rel. Attorney General v. Delaware and Hudson Co., 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

. I wish to make it plain that I do not fault the appellants for making the argument, understanding that they must if they wish to preserve it for Supreme Court review. Nonetheless, I think it is only the High Court and not this one that may act upon that argument.

. The fact that the adoption has been by legislation rather than court decision does not deprive the change in law of common law force. As the Supreme Court has noted, "the policy decisions of the states bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one[,]” and further has told us that "it is of no consequence that recognition of the privilege in the vast majority of the states is the product of legislative action rather than judicial decision.” Jaffee v. Redmond, 518 U.S. 1, 12-13, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).